# IN THE SUPREME COURT OF TENNESSEE
# AT NASHVILLE
### September 3, 2009 Session Heard at Knoxville

## LEE MEDICAL, INC. v. PAULA BEECHER ET AL.

**Appeal by Permission from the Court of Appeals, Middle Section**
**Circuit Court for Williamson County**
**Nos. 08-144 & 08-146      Jeffrey S. Bivins, Judge**

_____

**No. M2008-02496-SC-S09-CV - Filed May 24, 2010**

_____

This appeal involves the application of the Tennessee Peer Review Law of 1967 [Tenn. Code Ann. § 63-6-219 (Supp. 2009)] to a hospital system's business decision regarding the provision of vascular access services to patients in its member hospitals. The hospital system had customarily outsourced these services at several of its hospitals, but, following an audit, it decided to discontinue outsourcing the services and to begin providing them using nurses employed by its own hospitals. After several of the system's hospitals cancelled their vascular access services contracts, the vendor that had been providing the services filed two suits in the Circuit Court for Sumner County against the manufacturer of the catheters used to provide the services and one of its employees, a staffing affiliate of the hospital system and two of its employees, and the chief nursing officer at one of the system's hospitals. These suits, which were eventually transferred to the Circuit Court for Williamson County and consolidated, sought damages under numerous theories based on the vendor's allegations that the defendants, all of whom had played a role in the audit, had disparaged the manner in which it had been providing the vascular access services and had improperly interfered with its contracts. During discovery, the vendor sought copies of various records relating to the audit of its services. The defendants claimed that these records were covered by the privilege in Tenn. Code Ann. § 63-6-219(e). After reviewing the disputed records in chambers, the trial court determined that most of the requested records were covered by the privilege. The trial court also granted the vendor permission to pursue an interlocutory appeal to the Court of Appeals; however, the Court of Appeals declined to accept the appeal. We granted the vendor's Tenn. R. App. P. 11 application to address the trial court's interpretation and application of Tenn. Code Ann. § 63-6-219(e). We have determined that the trial court interpreted the privilege in Tenn. Code Ann. § 63-6-219(e) too broadly. Therefore, we vacate the portions of the trial court's discovery orders applying the privilege in Tenn. Code Ann. § 63-6-219(e) and remand the case to the trial court for further proceedings.

**Tenn. R. App. P. 11 Appeal by Permission; Judgment of the Circuit Court Vacated and Remanded**

WILLIAM C. KOCH, JR., J., delivered the opinion of the Court, in which CORNELIA A. CLARK, and SHARON G. LEE, JJ., joined. GARY R. WADE, J., filed a dissenting opinion, in which JANICE M. HOLDER, C.J. joined.

Ron H. Pursell and Edward A. Hadley, Nashville, Tennessee, for the appellant, Lee Medical, Inc.

Steven A. Riley and Sarah J. Glasgow, Nashville, Tennessee, for the appellees, Cathy Philpott, Paula Beecher and All About Staffing, Inc. and Non-Party Subpoena Recipients Hendersonville Medical Center, and Mike Esposito.

George H. Cate, III, Nashville, Tennessee, Timothy J. Rivelli, Cornelius M. Murphy, Linda T. Coberly, and Amanda R. Conley, Chicago, Illinois, for the appellees, Bard Access Systems, Inc. and Heather Chambers.

Marshall T. Cook, Hendersonville, Tennessee, for the appellee, Kim Alsbrooks.

G. Brian Jackson and David L. Johnson, Nashville, Tennessee, for the Amicus Curiae, Tennessee Hospital Association.

## OPINION

## I.[1]

HCA, Inc. owns and operates the TriStar Health System that consists of twenty-one hospitals in three states. Since 1997, several of the hospitals in the TriStar Health System located in Middle Tennessee outsourced their vascular access services[2] to Lee Medical, Inc.

---

[1] The following recitation of facts is taken from the parties' allegations and assertions found in various papers they have filed in the trial court. These factual statements are not determinative of the factual issues with regard to which the parties have not had a full hearing. Our inclusion of any particular fact in this opinion should not be construed as a conclusive finding of fact that prevents the parties from presenting additional evidence regarding the fact or prevents the trial court or the jury from making contrary findings.

[2] In this case, "vascular access services" refers to procedures for the insertion of peripherally inserted central catheters ("PICC lines") and extended dwell peripheral catheters ("EDPCs") that provide vascular access for hospitalized patients. Among other purposes, they are used to deliver intravenous antibiotic

(continued...)

("Lee Medical").[3]  Accordingly, when physicians with patients at one of these hospitals ordered a PICC line or EDPC for their patients, a specially trained nurse employed by Lee Medical performed the procedure.

In July 2005, the TriStar Health System's CNO Council[4] decided to examine the cost and quality benefits of providing vascular access services internally rather than continuing to outsource them.  The CNO Council enlisted the assistance of All About Staffing, Inc. ("All About Staffing"), another HCA-affiliated company,[5] to assist with its analysis of the provision of vascular access services at the TriStar hospitals.  All About Staffing provides nurse staffing to HCA-related hospitals.[6]

In November 2005, while All About Staffing's review of vascular access services was proceeding, Lee Medical submitted a revised contract for services to Cathy Philpott, the chief

---

[2](...continued)
treatment, chemotherapy, or long-term intravenous feeding for nutritional support.  Radiological Soc'y of N. Am., Vascular Access Procedures (July 6, 2009), http://www.radiologyinfo.org/en/pdf/vasc_access.pdf, at 1.  PICC lines are long, thin, flexible tubes that are inserted by physicians or specially trained nurses into a peripheral vein, usually in an arm, and then are guided to a central vein that leads to the heart.  *See* MayoClinic.com, Video: PICC line placement, http://www.mayoclinic.com/health/picc-line-placement/MM00781.  Other types of extended dwell catheters, such as midline catheters, terminate in the extremity rather than in a large vein near the heart.  Emily Rhinehart & Mary McGoldrick, *Infection Control in Home Health Care and Hospice* 39 (2d ed. 2006); Sharon Weinstein & Ada L. Plumer, *Principles and Practice of Intravenous Therapy* 651 (8th ed. 2007).  These catheters may remain in place for several days or several months.  Lisa S. Higa, Infection Control Today, IV Catheters, at http://www.vpico.com/article manager/printerfriendly.aspx?article=60390.  Infections at the insertion site and blood stream infections are two of the complications associated with the use of these devices.  Radiological Soc'y of N. Am., Vascular Access Procedures (July 6, 2009), http://radiologyinfo.org/en/pdf/vasc_access.pdf, at 4-5.

[3]Lee Medical alleged in its complaint that it began providing vascular access services to patients at Hendersonville Medical Center in 1997.  It also alleged that it began providing these services to patients at Skyline Medical Center and Tennessee Christian Medical Center (now the Skyline Madison Campus) in 2001 and to patients at Summit Medical Center in 2004.

[4]An affidavit submitted by TriStar's Vice President of Quality and Clinical Performance states that the CNO Council consists of "the chief nursing officers and other necessary individuals from each HCA/TriStar hospital."  She explained that the CNO Council meets "in order to assist in evaluating and improving the quality of healthcare provided at all of the hospitals in the HCA/TriStar division."

[5]All About Staffing is a Florida corporation that is wholly-owned by Southwest Florida Health System, Inc. which is an affiliate of HCA.

[6]Lee Medical asserts in its complaint that All About Staffing provides "a wide range of nursing services including vascular access services to health care facilities" and that it is "a market competitor . . . in providing vascular access services."

nursing officer at Hendersonville Medical Center, one of the hospitals in the TriStar Health System. Upon receipt of this contract, Ms. Philpott began evaluating Lee Medical's performance at Hendersonville Medical Center.

Lee Medical used catheters manufactured by Bard Access Systems, Inc. ("Bard") in its provision of vascular access services at the TriStar hospitals. Accordingly, All About Staffing sought Bard's assistance with its evaluation of the vascular access services being provided at the TriStar hospitals. Bard's help took two forms. First, two Bard representatives – Heather Chambers[7] and Kim Alsbrooks[8] – conducted "chart reviews" at various TriStar hospitals, including hospitals that had contracts with Lee Medical and those that did not. Second, in March 2006, Ms. Chambers provided All About Staffing a "business plan that shows cost justification for your nurses to place the PICCs at bedside." Although the record is unclear on this point, Bard's report, apparently titled "PICC Proposal for Tri-Star System" ("Bard Report") included not only the business plan mentioned by Ms. Chambers but also the results of the "chart reviews" that had been conducted by Mses. Chambers and Alsbrooks.

The record does not precisely define the sequence of events involving TriStar's consideration of All About Staffing's report. According to TriStar's Vice President for Quality and Clinical Performance, the CNO Council "determined that, from a clinical standpoint, the HCA/TriStar Hospitals should bring this service in house and use AAS-staffed[9] nurses to provide vascular access services." The report was then presented to the TriStar CFO Council.[10] According to TriStar's Vice President for Quality and Clinical Performance, the CFO Council determined "from a financial standpoint . . . that the HCA/TriStar Hospitals should use in-house AAS-staffed nurses to provide vascular access services." At some point,[11] Ms. Philpott's findings and opinions regarding the provision of

[7]Ms. Chambers served as Bard's "Nashville Territory Manager."

[8]Ms. Alsbrooks had worked for Bard as an "Independent Clinical Educator" since 2004. She had also been employed by Lee Medical as a nurse specialist from May 2005 through December 2005.

[9]"AAS" refers to All About Staffing.

[10]An affidavit submitted by TriStar's Vice President of Quality and Clinical Performance states that the HCA/TriStar CFO Council includes the chief financial officers from each of the HCA/TriStar hospitals. One of its purposes is to evaluate the cost of health care rendered at the HCA/TriStar hospitals.

[11]Lee Medical's complaint states that on or about May 21, 2006, Ms. Philpott made "false and defamatory statements" about its services to supervisors and nursing personnel at Hendersonville Medical Center and that "[o]n other occasions, she made false statements to the TriStar CNO Council." It also alleged
(continued...)

-4-

vascular access services at Hendersonville Medical Center were also presented to Hendersonville Medical Center's Quality Management Council,[12] the TriStar CNO Council, and the TriStar CFO Council.

In June or July 2006, the president of Lee Medical contacted Paula Beecher, All About Staffing's Regional Vice President for Operations, to discuss entering into a contract to provide vascular access services for the other TriStar hospitals that were not already under contract with Lee Medical. Ms. Beecher invited Lee Medical to submit a proposal. The record contains no indication that Lee Medical was aware that TriStar had been considering bringing vascular access services in house for almost one year.

As a result of the decisions made by its CNO Council and CFO Council, the TriStar System decided to terminate the existing contracts with Lee Medical in due course. Lee Medical submitted a "Proposal for Services" to Ms. Beecher on August 1, 2006, along with an unsolicited confidential report containing "data outcomes related to the quality of services" that Lee Medical had provided at Hendersonville Medical Center and Skyline Medical Center. However, in light of TriStar's decision to perform the vascular access services in house, All About Staffing did not contract with Lee Medical to provide these services at other TriStar hospitals. The record is unclear about when or how All About Staffing or TriStar communicated this decision to Lee Medical.

On October 23, 2006, Tennessee Christian Medical Center became the first TriStar hospital to cancel its contract with Lee Medical.[13] On October 31, 2006, Randy Oxley, Lee Medical's Director of Operations, sent an email to Ms. Beecher expressing concern that "the results of the audit are being used by the Hendersonville Medical Center as a method to raise some questions with regard to Lee Medical." The following day, Hendersonville Medical

_____

[11](...continued)
that Ms. Philpott based her findings and opinions on the "chart review" that Bard conducted at Hendersonville Medical Center.

[12]According to an affidavit submitted by the hospital's Director of Quality and Risk, this Council is composed of appointed physicians and nurses working at the hospital. It is chaired by a physician who is the chief of staff-elect. The primary purpose of the Council is "to monitor, evaluate and improve upon the quality of patient care provided to . . . [the hospital's] patients. In so doing, the Quality Management Council reviews medical care provided to patients in the hospital." Accordingly, it prepares and monitors confidential risk management reports that are used in the evaluation of patient care at the hospital.

[13]Lee Medical's April 18, 2007 complaint did not allege that its contract with Tennessee Christian Medical Center had been terminated. However, its complaint filed on October 25, 2007, alleged that its contract with Tennessee Christian Medical Center had been terminated effective October 23, 2006.

Center terminated its contract with Lee Medical.[14]  On November 9, 2006, Ms. Beecher "reassured" Mr. Oxley that

> the audit we conducted surveyed the use of all intravascular access, Peripheral lines, PICC lines, central lines, etc. for all of our TriStar facilities.  We at HCA are dedicated to [providing] the most appropriate quality care for our patients.  The results of the audit were not used to evaluate the quality service of Lee Medical Service.  This audit was utilized to ensure proper line utilization for our patients in the most cost effective manner.

Lee Medical was not reassured.

On April 18, 2007, Lee Medical filed suit in the Circuit Court for Sumner County against Bard and Mses. Alsbrooks, Chambers, and Philpott.[15]  It sought $15,000,000 in compensatory damages, as well as treble damages and punitive damages, based on various claims, including libel, slander, tortious interference with business relationships, civil conspiracy, negligent misrepresentation, breach of contract, inducement to breach a contract, breach of fiduciary duty, and violation of the Tennessee Consumer Protection Act.  On October 25, 2007, Lee Medical filed a second suit in the Chancery Court for Sumner County against Ms. Beecher and All About Staffing.[16]  This suit also sought $15,000,000 in damages on claims similar to those asserted in its first lawsuit.

Lee Medical also commenced an aggressive discovery campaign on the day it filed its first complaint.  It had subpoenas duces tecum issued; it served lengthy interrogatories; and it gave notice of taking depositions from parties and non-parties.  Lee Medical believed that TriStar's decision to stop outsourcing vascular access services was the result of defamatory remarks about the quality of its services made by Mses. Alsbrooks, Beecher, Chambers, and Philpott, and that their conduct had been instigated by All About Staffing and Bard who desired to wrest away TriStar's business.  Accordingly, the purpose of this discovery was to obtain information regarding the basis for TriStar's decision to stop

---

[14]According to Lee Medical's complaint filed on October 25, 2007, Skyline Medical Center cancelled its contract on July 30, 2007.

[15]When Lee Medical filed this complaint, it still had contracts with Summit Medical Center and Skyline Medical Center.

[16]By the time Lee Medical filed this complaint, it only had a contract with Summit Medical Center because Skyline Medical Center cancelled its contract on July 30, 2007.

outsourcing vascular access services and to terminate its contracts. Lee Medical believed that the Bard Report was "at the center" of the litigation.

The defendants and the two non-parties who had received subpoenas and notices of depositions[17] did not provide Lee Medical with all of the records it requested. However, they provided complete copies of some of the records and redacted copies of others. With regard to the materials they declined to produce, the defendants and the non-parties asserted that these records were protected by either the attorney-client privilege, the work product privilege, or the "peer review privilege" in Tenn. Code Ann. § 63-6-219(e). Among the records that Ms. Philpott produced was a redacted version of the Bard Report. Ms. Philpott did not provide Lee Medical with the portion of the report that had been "gathered from risk management reports."

The defendants and the non-parties also provided Lee Medical with privilege logs in accordance with Tenn. R. Civ. P. 26.02(5) identifying the categories of items that they believed to be privileged. Ms. Philpott's privilege log identified fifteen items. The privilege log submitted by Hermitage Medical Center and Mr. Esposito identified eighteen items, eleven of which also appeared in Ms. Philpott's privilege log. The privilege log submitted by All About Staffing and Ms. Beecher contained nine items, seven of which also appeared on Ms. Philpott's privilege log.

Lee Medical was dissatisfied with the responses to its discovery requests, particularly with regard to the Bard Report, and filed motions to compel the production of most of the withheld records. It insisted that the records were not protected by the privilege in Tenn. Code Ann. § 63-6-219(e) because (1) the privilege involves only the peer review of physicians, (2) the privilege applies only to committees made up of licensed physicians, (3) the privilege does not apply to original sources of information, and (4) the information it seeks falls within the exception to the privilege for documents and evidence regarding the "good faith, malice, and reasonable knowledge or belief" recognized by this Court in *Eyring v. Fort Sanders Parkwest Medical Center, Inc.*, 991 S.W.2d 230, 239 (Tenn. 1999).

Ms. Beecher and All About Staffing moved to dismiss the complaint against them on the ground of improper venue. In response, Lee Medical moved to consolidate its complaint against Ms. Beecher and All About Staffing with its complaint against Bard and Mses. Alsbrooks, Chambers, and Philpott. On January 9, 2008, the Circuit Court for Sumner County transferred both cases to the Circuit Court for Williamson County in accordance with

---

[17]These non-parties included Hendersonville Medical Center and Mike Esposito, the chief executive officer of Hendersonville Medical Center.

Tenn. Code Ann. § 16-1-116 (2009). Thereafter, on May 7, 2008, the trial court in Williamson County consolidated the cases.

On May 8, 2008, the trial court directed the defendants and the non-parties to submit the withheld records identified in their privilege logs for inspection by the court in chambers. Following a hearing on May 19, 2008, the trial court entered an order on June 5, 2008, addressing the discovery of the disputed records. The court first determined that the TriStar CNO Council, the TriStar CFO Council, and the Hendersonville Medical Center's Quality Management Council were medical review committees as defined in Tenn. Code Ann. § 63-6-219(c). Turning its attention to the records covered by the privilege logs, the trial court concluded that two of the fifteen items retained by Ms. Philpott should be produced. However, the court specifically determined that the Bard Report was shielded from production by Tenn. Code Ann. § 63-6-219(e). The trial court concluded that none of the items on the privilege log submitted by All About Staffing and Ms. Beecher were discoverable.

The trial court also determined that three of the eighteen items included on the privilege log submitted by Hendersonville Medical Center and Mr. Esposito should be produced. However, the trial court deferred ruling on the production of two remaining items and on the question of whether Lee Medical was entitled to limited discovery regarding its malice claim and its claim that it was entitled to a hearing before the cancellation of its contracts.

The parties submitted additional briefs, and on June 30, 2008, the trial court conducted a hearing with regard to the remaining disputed issues. On July 21, 2008, the court directed Hendersonville Medical Center and Mr. Esposito to produce the two remaining unresolved items on its privilege log and reaffirmed its decisions with regard to all the other items on all the privilege logs.

The trial court's two clear and definitive discovery orders did not end the parties' discovery skirmish. They continued to trade motions to compel, motions for contempt and sanctions, and motions for protective orders. Lee Medical filed a timely application for permission to pursue a Tenn. R. App. P. 9 interlocutory appeal. On October 27, 2008, the trial court granted Lee Medical permission to seek an interlocutory appeal; however, on December 4, 2008, the Court of Appeals denied Lee Medical's application for permission to appeal. We granted Lee Medical's Tenn. R. App. P. 11 application in order to address the trial court's interpretation and application of the privilege in Tenn. Code Ann. § 63-6-219(e).

## II.

This appeal involves a pretrial discovery dispute. The sole issue presented is whether the trial court erred by refusing to order the discovery of the Bard Report and other records sought by Lee Medical that relate to TriStar's decision to stop outsourcing the vascular access services at its hospitals. Because decisions regarding pretrial discovery are inherently discretionary, they are reviewed using the "abuse of discretion" standard of review. *Doe 1 ex rel. Doe 1 v. Roman Catholic Diocese of Nashville*, 154 S.W.3d 22, 42 (Tenn. 2005); *Benton v. Snyder*, 825 S.W.2d 409, 416 (Tenn. 1992); *Loveall v. Am. Honda Motor Co.*, 694 S.W.2d 937, 939 (Tenn. 1985).

The abuse of discretion standard of review envisions a less rigorous review of the lower court's decision and a decreased likelihood that the decision will be reversed on appeal. *Beard v. Bd. of Prof'l Responsibility*, 288 S.W.3d 838, 860 (Tenn. 2009); *State ex rel. Jones v. Looper*, 86 S.W.3d 189, 193 (Tenn. Ct. App. 2000). It reflects an awareness that the decision being reviewed involved a choice among several acceptable alternatives. *Overstreet v. Shoney's, Inc.*, 4 S.W.3d 694, 708 (Tenn. Ct. App. 1999). Thus, it does not permit reviewing courts to second-guess the court below, *White v. Vanderbilt Univ.*, 21 S.W.3d 215, 223 (Tenn. Ct. App. 1999), or to substitute their discretion for the lower court's, *Henry v. Goins*, 104 S.W.3d 475, 479 (Tenn. 2003); *Myint v. Allstate Ins. Co.*, 970 S.W.2d 920, 927 (Tenn. 1998). The abuse of discretion standard of review does not, however, immunize a lower court's decision from any meaningful appellate scrutiny. *Boyd v. Comdata Network, Inc.*, 88 S.W.3d 203, 211 (Tenn. Ct. App. 2002).

Discretionary decisions must take the applicable law and the relevant facts into account. *Konvalinka v. Chattanooga-Hamilton County Hosp. Auth.*, 249 S.W.3d 346, 358 (Tenn. 2008); *Ballard v. Herzke*, 924 S.W.2d 652, 661 (Tenn. 1996). An abuse of discretion occurs when a court strays beyond the applicable legal standards or when it fails to properly consider the factors customarily used to guide the particular discretionary decision. *State v. Lewis*, 235 S.W.3d 136, 141 (Tenn. 2007). A court abuses its discretion when it causes an injustice to the party challenging the decision by (1) applying an incorrect legal standard, (2) reaching an illogical or unreasonable decision, or (3) basing its decision on a clearly erroneous assessment of the evidence. *State v. Ostein*, 293 S.W.3d 519, 526 (Tenn. 2009); *Konvalinka v. Chattanooga-Hamilton County Hosp. Auth.*, 249 S.W.3d at 358; *Doe 1 ex rel. Doe 1 v. Roman Catholic Diocese of Nashville*, 154 S.W.3d at 42.

To avoid result-oriented decisions or seemingly irreconcilable precedents, reviewing courts should review a lower court's discretionary decision to determine (1) whether the factual basis for the decision is properly supported by evidence in the record, (2) whether the lower court properly identified and applied the most appropriate legal principles applicable

to the decision, and (3) whether the lower court's decision was within the range of acceptable alternative dispositions. *Flautt & Mann v. Council of Memphis*, 285 S.W.3d 856, 872-73 (Tenn. Ct. App. 2008) (quoting *BIF, a Div. of Gen. Signal Controls, Inc. v. Service Constr. Co.*, No. 87-136-II, 1988 WL 72409, at *3 (Tenn. Ct. App. July 13, 1988) (No Tenn. R. App. P. 11 application filed)). When called upon to review a lower court's discretionary decision, the reviewing court should review the underlying factual findings using the preponderance of the evidence standard contained in Tenn. R. App. P. 13(d) and should review the lower court's legal determinations de novo without any presumption of correctness. *Johnson v. Nissan N. Am., Inc.*, 146 S.W.3d 600, 604 (Tenn. Ct. App. 2004); *Boyd v. Comdata Network, Inc.*, 88 S.W.3d at 212.

The discretionary decision at the center of this discovery dispute is the trial court's acceptance of the defendants' assertions that a number of the records sought by Lee Medical are protected from discovery by the privilege in Tenn. Code Ann. § 63-6-219(e). There are several other legal principles particularly applicable to claims of privilege in civil cases.

The first principle is that Tennessee's discovery and evidentiary rules reflect a broad policy favoring discovery of all relevant, non-privileged information. *Harrison v. Greeneville Ready-Mix, Inc.*, 220 Tenn. 293, 302, 417 S.W.2d 48, 52 (1967); *Wright v. United Servs. Auto. Ass'n*, 789 S.W.2d 911, 915 (Tenn. Ct. App. 1990). This policy enables the parties and the courts to seek the truth so that disputes will be decided by facts rather than by legal maneuvering. *White v. Vanderbilt Univ.*, 21 S.W.3d at 223. This policy is also reflected in Tenn. R. Evid. 501 which embodies the general concept that evidence should ordinarily be made available to the trier of fact to facilitate the ascertainment of the truth. Neil P. Cohen et al., *Tennessee Law of Evidence* § 5.01[2], at 5-12 (5th ed. 2005); *see also Univ. of Pa. v. EEOC*, 493 U.S. 182, 189 (1990) (declining to exercise authority to create privileges expansively).

The second principle is that privileges present obstacles to the search for the truth. VIII John H. Wigmore, *Evidence* § 2196, at 111 (McNaughten Rev. 1961) (hereinafter "Wigmore"); *see also* 23 Charles A. Wright & Kenneth W. Graham, Jr., *Federal Practice and Procedure* § 5422, at 677 (1980). They are not designed or intended to facilitate the fact-finding process or to safeguard its integrity. Rather than illuminating the truth, their effect is to "shut out the light." 1 *McCormick on Evidence* § 72, at 339 (Kenneth S. Broun, ed., 6th ed. 2006) (hereinafter "McCormick"). Privileges protect "interests and relationships which, rightly or wrongly, are regarded as of sufficient social importance to justify some sacrifice of the availability of evidence relevant to the administration of justice." McCormick, § 72, at 339; *see also Trammel v. United States*, 445 U.S. 40, 50 (1980) (privileges are accepted "only to the very limited extent that permitting a refusal to testify or excluding relevant evidence has a public good transcending the normally predominant

principle of utilizing all rational means for ascertaining the truth.") (quoting *Elkins v. United States*, 364 U.S. 206, 234 (1960) (Frankfurter, J., dissenting)).

The third principle is that the rules of evidence generally disfavor privileges in civil proceedings. *State ex rel. Flowers v. Tenn. Trucking Ass'n Self Ins. Group Trust*, 209 S.W.3d 602, 616 n.13 (Tenn. Ct. App. 2006); Wigmore, § 2192, at 72-73. While courts must construe and apply statutory privileges according to their plain meaning, both federal and state courts frequently note that privileges should not be broadly construed because they are in derogation of the public's "right to every man's evidence." Edward J. Imwinkelried, *The New Wigmore: Evidentiary Privileges* §§ 3.2.2, at 129-30 & 4.3.3, at 248 (2002) (quoting Wigmore, § 2192, at 70); *see also United States v. Bryan*, 339 U.S. 323, 331 (1950). As the United States Supreme Court has noted, privileges, as "exceptions to the demand for every man's evidence are not lightly created nor expansively construed, for they are in derogation of the search for truth." *United States v. Nixon*, 418 U.S. 683, 710 (1974), *superseded by statute on other grounds*, Fed. R. Evid. 104(a), *as recognized in Bourjaily v. United States*, 483 U.S. 171, 179 (1987), *superseded by statute on other grounds*, Fed. R. Evid. 801(d)(2), *as recognized by United States v. Kemp*, No. CR.A. 04-370, 2005 WL 352700, at *2 (E.D. Pa. Feb. 10, 2005).

## III.

The trial court's decisions regarding the discovery of the materials sought by Lee Medical implicate the evidentiary privilege in the Tennessee Peer Review Act of 1967. The current statute differs markedly from the original one because of the eleven amendments since the original statute's enactment forty-three years ago. These amendments have broadened the application of the statute at the expense of its clarity. In previous cases, the courts have noted that the statute contains syntax errors[18] and irreconcilable conflicts.[19] The Court of Appeals has recently characterized the statutes as "not a shining example of legislative drafting." *Smith v. Pratt*, No. M2008-01540-COA-R9-CV, 2009 WL 1086953, at *2 (Tenn. Ct. App. Apr. 22, 2009) (No Tenn. R. App. P. 11 application filed).

This case brings to the fore another significant internal conflict in the statute that affects the application of the privilege in Tenn. Code Ann. § 63-6-219(e). The conflict

---

[18]*Stratienko v. Chattanooga-Hamilton County Hosp. Auth.*, 226 S.W.3d 280, 284 (Tenn. 2007).

[19]*Roy v. City of Harriman*, 279 S.W.3d 296, 305 (Tenn. Ct. App. 2008) (Swiney, J., concurring) (noting a conflict between Tenn. Code Ann. § 63-6-219(e) and Tenn. Code Ann. § 63-6-219(d)(2) regarding the ability to discover evidence that the person knowingly submitted false information to a peer review committee).

cannot be resolved by considering the text of the statute alone. After employing the recognized principles of statutory construction, we have determined that the privilege in Tenn. Code Ann. § 63-6-219(e) applies only to peer review proceedings before a peer review committee as defined in Tenn. Code Ann. § 63-6-219(c) that involve a physician's conduct, competence, or ability to practice medicine.

**A.**

When courts are called upon to construe a statute, their goal is to give full effect to the General Assembly's purpose, stopping just short of exceeding its intended scope. *Larsen-Ball v. Ball*, 301 S.W.3d 228, 232 (Tenn. 2010); *In re Estate of Tanner*, 295 S.W.3d 610, 613 (Tenn. 2009). Because the legislative purpose is reflected in a statute's language, the courts must always begin with the words that the General Assembly has chosen. *Waldschmidt v. Reassure Am. Life Ins. Co.*, 271 S.W.3d 173, 176 (Tenn. 2008). Courts must give these words their natural and ordinary meaning. *Hayes v. Gibson County*, 288 S.W.3d 334, 337 (Tenn. 2009). And because these words are known by the company they keep, courts must also construe these words in the context in which they appear in the statute and in light of the statute's general purpose. *State v. Flemming*, 19 S.W.3d 195, 197 (Tenn. 2000); *State ex rel. Comm'r of Transp. v. Medicine Bird Black Bear White Eagle*, 63 S.W.3d 734, 754-55 (Tenn. Ct. App. 2001); *N.C. & St. L. Ry. v. Carroll County*, 12 Tenn. App. 380, 387, 1930 WL 1711, at *5 (1930).

When a statute's text is clear and unambiguous, the courts need not look beyond the statute itself to ascertain its meaning. *Green v. Green*, 293 S.W.3d 493, 507 (Tenn. 2009); *State v. Strode*, 232 S.W.3d 1, 9-10 (Tenn. 2007). Statutes, however, are not always clear and unambiguous. Accordingly, when the courts encounter ambiguous statutory text – language that can reasonably have more than one meaning[20] – we must resort to the rules of statutory construction and other external sources to ascertain the General Assembly's intent and purpose. *See Calaway ex rel. Calaway v. Schucker*, 193 S.W.3d 509, 516 (Tenn. 2005); *In re Conservatorship of Clayton*, 914 S.W.2d 84, 90 (Tenn. Ct. App. 1995).

Conflicting provisions in a statute may create ambiguity. In this circumstance, the courts should endeavor to give effect to the entire statute by harmonizing the conflicting provisions, *Hill v. City of Germantown*, 31 S.W.3d 234, 238 (Tenn. 2000); *State v. Odom*, 928 S.W.2d 18, 30 (Tenn. 1996), and by construing each provision consistently and reasonably. *Sallee v. Barrett*, 171 S.W.3d 822, 828 (Tenn. 2005); *In re D.L.B.*, 118 S.W.3d 360, 365 (Tenn. 2003). The courts should avoid basing their interpretation on a single

[20]*LeTellier v. LeTellier*, 40 S.W.3d 490, 498 (Tenn. 2001); *Bryant v. HCA Health Servs. of N. Tenn., Inc.*, 15 S.W.3d 804, 809 (Tenn. 2000).

sentence, phrase, or word, *Westinghouse Elec. Corp. v. King*, 678 S.W.2d 19, 23 (Tenn. 1984), but should instead endeavor to give effect to every clause, phrase, or word in the statute. *Cohen v. Cohen*, 937 S.W.2d 823, 828 (Tenn. 1996). The courts' goal is to construe a statute in a way that avoids conflict and facilitates the harmonious operation of the law. *Frazier v. E. Tenn. Baptist Hosp., Inc.*, 55 S.W.3d 925, 928 (Tenn. 2001); *In re Audrey S.*, 182 S.W.3d 838, 869 (Tenn. Ct. App. 2005).

The rules of statutory construction permit the courts to employ a number of presumptions with regard to the legislative process. The courts may, for example, presume that the General Assembly used every word deliberately and that each word has a specific meaning and purpose. *State v. Hawk*, 170 S.W.3d 547, 551 (Tenn. 2005); *Johnson v. LeBonheur Children's Med. Ctr.*, 74 S.W.3d 338, 343 (Tenn. 2002). The courts may also presume that the General Assembly did not intend to enact a useless statute, *State v. Jackson*, 60 S.W.3d 738, 742 (Tenn. 2001), and that the General Assembly "did not intend an absurdity." *Fletcher v. State*, 951 S.W.2d 378, 382 (Tenn. 1997).

With specific regard to the legislators' knowledge of the existing law affecting the subject matter of the legislation, the courts may presume that the General Assembly knows the "state of the law." *Murfreesboro Med. Clinic, P.A. v. Udom*, 166 S.W.3d 674, 683 (Tenn. 2005). In addition, the courts may presume that the General Assembly is aware of its own prior enactments, *Colonial Pipeline Co. v. Morgan*, 263 S.W.3d 827, 836 (Tenn. 2008). The courts may likewise presume that the General Assembly is aware of the manner in which the courts have construed the statutes it has enacted. *Hicks v. State*, 945 S.W.2d 706, 707 (Tenn. 1997); *McKinney v. Hardwick Clothes, Inc.*, 217 Tenn. 457, 458, 398 S.W.2d 265, 265 (1966).

When courts are attempting to resolve a statutory ambiguity, the rules of statutory construction authorize them to consider matters beyond the text of the statute being construed. The courts may consider, among other things, public policy,[21] historical facts preceding or contemporaneous with the enactment of the statute being construed,[22] and the background and purpose of the statute.[23] The courts may also consider earlier versions of the

---

[21] *Cronin v. Howe*, 906 S.W.2d 910, 912 (Tenn. 1995).

[22] *Davis v. Aluminum Co. of Am.*, 204 Tenn. 135, 143, 316 S.W.2d 24, 27 (1958); *Davis v. Beeler*, 185 Tenn. 638, 642-43, 207 S.W.2d 343, 345 (1948)

[23] *Eastman Chem. Co. v.* Johnson, 151 S.W.3d 503, 507 (Tenn. 2004); *Steele v. Indus. Dev. Bd. of Metro. Gov't of Nashville & Davidson County*, 950 S.W.2d 345, 348 (Tenn. 1997).

statute,[24] the caption of the act,[25] the legislative history of the statute,[26] and the entire statutory scheme in which the statute appears.[27] However, no matter how illuminating these non-codified external sources may be, they cannot provide a basis for departing from clear codified statutory provisions. *See State ex rel. Maner v. Leech*, 588 S.W.2d 534, 539 (Tenn. 1979).

**B.**

Today's version of the Tennessee Peer Review Law of 1967 in Tenn. Code Ann. § 63-6-219 bears little resemblance to the statute first enacted forty-three years ago. The Tennessee General Assembly has amended the statute eleven times. Some of the amendments have been specific and precise. Others, however, have been broad and open-ended. Several of the amendments, while internally consistent, do not have a close fit with related provisions in the statute.

In its current form,[28] Tenn. Code Ann. § 63-6-219 contains six sections. The first section, Tenn. Code Ann. § 63-6-219(a), which was added in 1992,[29] provides the popular name of the statute. The second section, Tenn. Code Ann. § 63-6-219(b), is the operative section that defines the purpose and application of the statute. It was also enacted in 1992[30] and has never been amended. The third section, Tenn. Code Ann. § 63-6-219(c), is the definitional section that consists of a single 248-word sentence. The fourth section, Tenn. Code Ann. § 63-6-219(d), contains the immunity provisions of the statute that date back to

---

[24]*Automatic Merch. Co. v. Atkins*, 205 Tenn. 547, 556, 327 S.W.2d 328, 332 (1959); *see also Seals v. H & F, Inc.*, 301 S.W.3d 237, 246 (Tenn. 2010); *Dockins v. Balboa Ins. Co.*, 764 S.W.2d 529, 532-33 (Tenn. 1989); *Roberts v. Cahill Forge & Foundry Co.*, 181 Tenn. 688, 692-94, 184 S.W.2d 29, 31 (1944).

[25]*Hyatt v. Taylor*, 788 S.W.2d 554, 556 (Tenn. 1990); *City of Kingsport v. Jones*, 196 Tenn. 544, 549, 268 S.W.2d 576, 578 (1954).

[26]*Fusner v. Coop Constr. Co.*, 211 S.W.3d 686, 691-92 (Tenn. 2007); *State ex rel. Pope v. U.S. Fire Ins. Co.*, 145 S.W.3d 529, 535 (Tenn. 2004).

[27]*State v. Hannah*, 259 S.W.3d 716, 721 (Tenn. 2008); *Wells v. Tenn. Bd. of Regents*, 231 S.W.3d 912, 916 (Tenn. 2007).

[28]The current version of Tenn. Code Ann. § 63-6-219 is attached as an appendix to this opinion.

[29]Act of Apr. 28, 1992, ch. 916, § 1, 1992 Tenn. Pub. Acts 901, 901.

[30]Act of Apr. 28, 1992, ch. 916, § 4, 1992 Tenn. Pub. Acts 901, 902.

its original enactment in 1967. This section has been amended six times[31] and currently bears little resemblance to the original immunity provision. The fifth section, Tenn. Code Ann. § 63-6-219(e), contains the privilege provision that was first enacted in 1975.[32] This section has been amended three times.[33] The sixth section, Tenn. Code Ann. § 63-6-219(f), added in 1999,[34] is simply a codified severability clause.

## C.

The ability of the litigants and the courts to apply the evidentiary privilege in Tenn. Code Ann. § 63-6-219(e) has been undermined by conflicting and ambiguous provisions in the statute itself. The first two sentences of Tenn. Code Ann. § 63-6-219(e),[35] when read in conjunction with the open-ended definition of "peer review committee" in Tenn. Code Ann. § 63-6-219(c), can be reasonably interpreted to mean that any record submitted to any committee fitting within Tenn. Code Ann. § 63-6-219(c)'s definition is privileged. On the other hand, the last sentence of Tenn. Code Ann. § 63-6-219(e)[36] can reasonably be interpreted to mean that any record made in the regular course of a hospital's business is not privileged, even if it was submitted to a committee included in Tenn. Code Ann. § 63-6-219(c).

---

[31]Act of May 2, 1975, ch. 117, § 1, 1975 Tenn. Pub. Acts 218, 219; Act of Mar. 16, 1988, ch. 609, §§ 1 - 2, 1988 Tenn. Pub. Acts 251, 251; Act of Feb. 8, 1990, ch. 596 § 1, 1990 Tenn. Pub. Acts 5, 5; Act of Mar. 28, 1994, ch. 732, § 5, 1994 Tenn. Pub. Acts 431, 432; Act of May 28, 1997, ch. 470, § 1, 1997 Tenn. Pub. Acts 844, 844-45; Act of May 17, 1999, ch. 305, § 1, 1999 Tenn. Pub. Acts 686, 686.

[32]Act of May 2, 1975, ch. 117, § 1, 1975 Tenn. Pub. Acts 218, 219-20.

[33]Act of May 11, 1983, ch. 344, § 2, 1983 Tenn. Pub. Acts 625, 626; Act of Apr. 28, 1992, ch. 916, § 3, 1992 Tenn. Pub. Acts 901, 902; Act of May 17, 1999, ch. 305, § 2, 1999 Tenn. Pub. Acts 686, 686.

[34]Act of May 17, 1999, ch. 305, § 3, 1999 Tenn. Pub. Acts 686, 686.

[35]The first two sentences of Tenn. Code Ann. § 63-6-219(e) read as follows:
All information, interviews, incident or other reports, statements, memoranda or other data furnished to any committee as defined in this section, and any findings, conclusions or recommendations resulting from the proceedings of such committee are declared to be privileged. All such information, in any form whatsoever, so furnished to, or generated by, a medical peer review committee, shall be privileged.

[36]The final sentence of Tenn. Code Ann. § 63-6-219(e) reads as follows:
Nothing contained in this subsection (e) applies to records made in the regular course of business by a hospital or other provider of health care and information, documents or records otherwise available from original sources are not to be construed as immune from discovery or use in any civil proceedings merely because they were presented during proceedings of such committee.

The tension between the "everything is privileged" and the "nothing is privileged" language in Tenn. Code Ann. § 63-6-219(e) is complicated by the General Assembly's steady expansion of the definition of "peer review committee" in Tenn. Code Ann. § 63-6-219(c). The repeated broadening of the definition in Tenn. Code Ann. § 63-6-219(e) has created the impression that the General Assembly likewise intended to expand the scope of the privilege in Tenn. Code Ann. § 63-6-219(e). This impression is reflected in the parties' arguments in this case. They have drawn the battlelines over whether the TriStar CNO Council and the TriStar CFO Council are "peer review committees" as defined in Tenn. Code Ann. § 63-6-219(c).

While the issue regarding whether a particular committee fits within the definition in Tenn. Code Ann. § 63-6-219(c) must necessarily be addressed in the process of determining whether records are privileged under Tenn. Code Ann. § 63-6-219(e), it is not the only issue that must be addressed. Decisions regarding the application of the privilege must take into account: (1) the subject matter of the proceeding, (2) the nature and source of the particular record being sought, and (3) the person or entity from whom the record is being sought.

**D.**

We begin our analysis of Tenn. Code Ann. § 63-6-219 with the candid observation, echoing the previous characterizations of this Court and the Court of Appeals, that the statute is far from clear and unambiguous.[37] Nonetheless, we will begin our analysis with the text of the statute itself. In the process of ascertaining the scope of the evidentiary privilege in Tenn. Code Ann. § 63-6-219(e), we must construe all provisions of the statute consistently and reasonably, and we must give effect to every sentence, clause, and word in the statute. Thus, the scope of Tenn. Code Ann. § 63-6-219(e) depends not only on the definitional section in Tenn. Code Ann. § 63-6-219(c), but also on the other sections of the statute.

The language added to the statute in 1992 provides a significant interpretative cue to the proper application of Tenn. Code Ann. § 63-6-219(e). This amendment made three pivotal changes in the statute. First, it added Tenn. Code Ann. § 63-6-219(a), thereby giving the statute its popular name – "Tennessee Peer Review Law of 1967." Second, it added the

---

[37]Our dissenting colleagues disagree with this conclusion. They have concluded that there is "no real ambiguity in the statutory provisions." We have already found Tenn. Code Ann. §63-6-219(e) to be ambiguous enough to require us to add punctuation in order to avoid "conflicting interpretations." *Stratienko v. Chattanooga-Hamilton County Hosp. Auth.*, 226 S.W.3d at 284. A clear and unambiguous statutory provision generally has a meaning that is not contradicted by other language in the same statute. Accordingly, individual subsections of a single statute should not be read in isolation but rather should be considered in the context of the statute as a whole. 2A Norman J. Singer & J.D. Shambie Singer, *Statutes and Statutory Construction* § 46.5, 189-205 (7th ed. 2007) ("*Statutes and Statutory Construction*").

operative purpose and application section in Tenn. Code Ann. § 63-6-219(b). Third, it included the term "peer review committee" as one of the terms defined in Tenn. Code Ann. § 63-6-219(c). The effect of these changes was to sharpen the focus of the statute.[38]

## THE ADDED EMPHASIS ON "PEER REVIEW"

We must presume that the General Assembly chose the term "peer review" carefully and deliberately in 1992. The common meaning of the word "peer" refers to a person of equal civil standing or rank, a contemporary, or a member of the same age-group or social set.[39] When used in the health care context, the term "peer review" was originally understood and continues to be understood to denote a process whose purpose is to maintain and improve the quality of health care by reviewing the performance of physicians and other health care providers.

Tenn. Code Ann. § 63-6-219(b)(1) states that the purpose of the privilege in Tenn. Code Ann. § 63-6-219(e) is to "encourage committees made up of Tennessee's licensed physicians[40] to candidly, conscientiously, and objectively evaluate and review their peers' professional conduct, competence, and ability to practice medicine." As used in this sentence, the word "peers" refers to the peers of licensed physicians, that is, other licensed physicians.

Our conclusion that the word "peers" in Tenn. Code Ann. § 63-6-219(b)(1) refers to licensed physicians is buttressed by the references in Tenn. Code Ann. § 63-6-219(b)(2) to the "medical profession" and to the explicit authority to review "physicians' fees." Likewise, the general immunity provisions in Tenn. Code Ann. § 63-6-219(d)(1) refer to "[p]hysicians health programs and physicians health peer review committees." Finally, Tenn. Code Ann.

---

[38]Despite their recognition that this Court has a duty to construe a statute so that "no part will be inoperative," our dissenting colleagues' interpretation of Tenn. Code Ann. § 63-6-219 relegates Tenn. Code Ann. § 63-6-219(b) to the status of a vestigial "statement of policy, prefatory in nature, which does not supercede the plain language of subsections (c) and (e)." Our analysis of the statutory text, the legislative history of this particular statute, and the history of the role of peer review proceedings in the provision of medical care lead us to a different conclusion. The General Assembly had a clear purpose in mind when it enacted Tenn. Code Ann. § 63-6-219(b) and the other related amendments in 1992.

[39]11 *Oxford English Dictionary* 435 (2d ed. 1983).

[40]In other cases, parties seeking to avoid the privilege have relied on this language to argue that only a committee composed entirely of physicians can qualify as a medical review committee or peer review committee. While this argument is not before us on this appeal, we note that Tenn. Code Ann. § 63-6-219(d)(1), as amended, plainly envisions that persons other than licensed physicians may serve on these committees.

§ 63-6-219(d)(2), which contains the exception to immunity for knowingly providing false information, is limited to proceedings of "a medical review committee regarding the competence or professional conduct of a physician."

THE EXPANSION OF THE DEFINITION OF "PEER REVIEW COMMITTEE"

The original 1967 version of the statute did not contain a definitional section. The General Assembly adopted the first statutory definition in 1975 when it defined the interchangeable terms "medical review committee" or "committee." The General Assembly broadened the scope of the definition in 1983[41] and 1987[42] by adding two more types of organizations to the definition.

In 1992, the General Assembly amended the terms being defined in Tenn. Code Ann. § 63-6-219(c) to include "peer review committee" as well as "medical review committee." As a result of the 1992 amendment, the same statutory definition applied to both "peer review committee" and "medical review committee." Thus, the terms "peer review committee" and "medical review committee" are interchangeable insofar as the statutory definition is concerned. For the purpose of this opinion, we have and will refer to the committees defined in Tenn. Code Ann. § 63-6-219(c) as "peer review committees."

The General Assembly amended the definition in Tenn. Code Ann. § 63-6-219(c) two more times after 1992.[43] On both occasions, the purpose of the amendment was to further broaden the definition of "peer review committee" to include additional groups and organizations. The history of the amendments to the statutory definition in Tenn. Code Ann. § 63-6-219(c) reflects the General Assembly's purpose to define the interchangeable terms "peer review committee" and "medical review committee" as broadly as possible.

However, the General Assembly's decision to broaden the scope of the definition of "peer review committee" in Tenn. Code Ann. § 63-6-219(c) does not necessarily mean that the General Assembly also intended to broaden the scope of the privilege in Tenn. Code Ann. § 63-6-219(e). To the contrary, the six amendments to this definition between 1975 and 2009 were for the purpose of adding more organizations, groups, and entities to the definition of "peer review committee." Thus, while the General Assembly plainly intended to apply

---

[41]Act of May 11, 1983, ch. 344, § 1, 1983 Tenn. Pub. Acts 625, 626.

[42]Act of May 12, 1987, ch. 315, § 1, 1987 Tenn. Pub. Acts 636, 637.

[43]Act of May 17, 1993, ch. 404, § 13, 1993 Tenn. Pub. Acts 692, 695; Act of Mar. 30, 2009, ch. 46, § 1, 2009 Tenn. Pub. Acts ___, ___.

the privilege in Tenn. Code Ann. § 63-6-219(e) to more entities, nothing in the language of the amendments reflects a purpose to broaden the scope of the privilege itself beyond the scope reflected in Tenn. Code Ann. § 63-6-219(b).

## IV.

Courts construing ambiguous statutes may also consider matters beyond the text of the statute. Our conclusions regarding the scope of the privilege in Tenn. Code Ann. § 63-6-219(e) based on the statutory language, legislative history and prior amendments are buttressed by five considerations external to the statute itself.

## A.

First, the chapter in which Tenn. Code Ann. § 63-6-219 is codified is Chapter 6 of Title 63. This chapter also includes the creation of the Board of Medical Examiners,[44] the requirements for obtaining a license to practice medicine,[45] and the definition of the practice of medicine.[46] Accordingly, Tenn. Code Ann. § 63-6-219 is grouped with other statutes that govern only the practice of medicine and surgery.

## B.

Second, a review of the statutes regulating other health care professionals demonstrates that the General Assembly plainly did not envision that the privilege in Tenn. Code Ann. § 63-6-219(e) would serve as a one-size-fits-all privilege that would be generally applicable to other health care professionals or entities. Had that been the General Assembly's intent, it would not have enacted separate peer review immunity provisions and privileges for other professional groups.[47]

---

[44]Tenn. Code Ann. § 63-6-101 (2004).

[45]Tenn. Code Ann. § 63-6-201 (2004).

[46]Tenn. Code Ann. § 63-6-204 (Supp. 2009).

[47]*See* Tenn. Code Ann. § 63-4-118 (2004) (chiropractors); Tenn. Code Ann. § 63-7-115(c)(3) (2004) (nurses); Tenn. Code Ann. § 63-9-114 (2004) (osteopathic physicians); Tenn. Code Ann. §§ 63-10-401 to -405 (2004 & Supp. 2009) (pharmacists); Tenn. Code Ann. § 63-11-220 (2004) (psychologists); and Tenn. Code Ann. § 63-5-131 (2004) (dentists). The General Assembly has also created peer review procedures for veterinarians in Tenn. Code Ann. § 63-12-138 (2004).

-19-

**C.**

Third, while we approach the legislative debates with some caution,[48] a review of the debates surrounding the enactment of the original legislation in 1967 and the eleven subsequent amendments enacted between 1975 and 2009 reflect the General Assembly's understanding that the privilege in Tenn. Code Ann. § 63-6-219(e) applies to physicians. Both the House and Senate sponsors of the 1967 legislation explained that the original bill was much broader and that the bill had been narrowed by amendment to apply only to committees concerned with recommending Medicare reimbursement for hospitalization. The House sponsor of the 1975 amendment that added the privilege explained that physicians "are reluctant to say another doctor is not practicing good medicine for fear of being sued by that particular physician" and that "[t]his bill will encourage doctors to police themselves to expose the bad practitioners who are causing the malpractice problem." *Smith v. Pratt*, 2009 WL 1086953, at *3 (quoting Representative J. Stanley Rogers). Finally, during the debate in the House Committee on Health and Human Services concerning the 1997 amendment, the House sponsor characterized Tenn. Code Ann. § 63-6-219 as providing that "physicians who serve on peer review panels . . . enjoy immunity . . . for peer review on other physicians."[49]

**D.**

Fourth, the history of the use of "peer review" in the field of health care demonstrates that its focus has consistently been on physicians. The medical profession has historically regulated itself using institutional-based processes designed to identify and remedy substandard care.[50] These processes, generically referred to as "peer review," are intended to ensure the existence of a qualified and competent medical staff and quality care.[51] In medicine, the peer review process consists of institutional employees meeting internally to debate recent mishaps in the hope that such roundtable-type discussions will encourage candid and uninhibited expressions of professional opinion for the purpose of improving the

---

[48]*In re Audrey S.*, 182 S.W.3d at 870; *BellSouth Telecomms., Inc. v. Greer*, 972 S.W.2d 663, 673 (Tenn. Ct. App. 1997); *see Statutes and Statutory Construction* §§ 48:13-48:15, at 600-615.

[49]Representative Mary Ann Eckles, House Committee on Health and Human Services, May 20, 1997.

[50]Robert S. Adler, *Stalking The Rogue Physicians: An Analysis of the Health Care Quality Improvement Act*, 28 Am. Bus. L.J. 683, 696 (1991).

[51]Ilene N. Moore et al., *Rethinking Peer Review: Detecting and Addressing Medical Malpractice Claims Risk*, 59 Vand. L. Rev. 1175, 1177 (2006) (hereinafter "Moore").

quality of the health care provided at the institution.[52]  Despite some internal dissent, the medical profession firmly believes that the peer review process is fundamental to improving the quality of health care.[53]

The first peer review efforts were established by the physicians themselves and were voluntary.[54]  In 1918, the American College of Surgeons implemented a peer review program to set minimum standards for hospitals and the medical profession.[55]  In 1952, the Joint Commission on Accreditation of Hospitals, now The Joint Commission, began to require hospitals to perform physician peer review in order to qualify for accreditation.[56]

Congress created Medicare and Medicaid when it enacted the Social Security Amendments of 1965.  To control the extent and the cost of the care provided to Medicare recipients by hospitals and extended care facilities, the Medicare statutes required institutions to establish utilization review committees, consisting of at least two physicians, to review the medical necessity of admissions, duration of hospitalization, and professional services rendered to the recipient.  Motivated by the same cost control concerns, Congress amended the Medicaid statutes in 1967 to require similar utilization review procedures.[57]

---

[52]Tenn. Code Ann. § 63-6-219(b)(1) (Supp. 2009) (stating that "the stated policy of Tennessee [is] to encourage committees made up of Tennessee's licensed physicians to candidly, conscientiously, and objectively evaluate and review their peers' professional conduct, competence, and ability to practice medicine."); *see also Grande v. Lahey Clinic Hosp., Inc.*, 725 N.E.2d 1083, 1085-86 (Mass. Ct. App. 2000); David L. Fine, *The Medical Peer Review Privilege in Massachusetts: A Necessary Quality Control Measure or an Ineffective Obstruction of Equitable Redress?*, 38 Suffolk U. L. Rev. 811, 812 (2005) (hereinafter "Fine").

[53]Charles R. Koepke, *Physician Peer Review Immunity: Time to Euthanize a Fatally Flawed Policy*, 22 J.L. & Health 1, 8 (2009); Susan O. Scheutzow, *State Medical Peer Review: High Cost But No Benefit – Is It Time for a Change?*, 25 Am. J.L. & Med. 7, 15 (1999) (hereinafter "Scheutzow").

[54]Moore, 59 Vand. L. Rev. at 1178.

[55]Scheutzow, 25 Am. J.L. & Med. at 12-13; Jeanne Darricades, Comment, *Medical Peer Review: How Is It Protected by the Health Care Quality Improvement Act of 1986?*, 18 J. Contemp. L. 263, 269-70 (1992) (hereinafter "Darricades").

[56]Scheutzow, 25 Am. J.L. & Med. at 13; B. Abbott Goldberg, *The Peer Review Privilege: A Law in Search of a Valid Policy*, 10 Am. J.L. & Med. 151, 151 (1984); Darricades, 18 J. Contemp. L. at 269.

[57]*Proposed Phaseout of PSROs and Utilization Review Requirements: Hearing Before the Subcomm. on Health of the S. Comm. on Finance*, 97th Cong. (1981), *reprinted in Peer Review Improvement Act of 1982: A Legislative History of Pub. Law 97-248*, at Doc. 5, p. 24 (Bernard D. Reams ed. 1990).

In the 1970s and 1980s, more states enacted peer review statutes in response to the increasing number of medical malpractice suits, the intensified focus on medical errors, and Congress's enactment of the Health Care Quality Improvement Act of 1986 ("HCQIA").[58] This Act[59] was precipitated by Congress's concern regarding the increasing occurrence of medical malpractice, the movement of physicians who had lost their privileges from one state to another, and *Patrick v. Burget*, 486 U.S. 94 (1988) in which the United States Supreme Court held that the state-action doctrine did not protect physicians from federal antitrust liability for their activities on hospital peer review committees. The HCQIA granted immunity from money damages to medical peer review committees,[60] but it did not specifically create a peer review privilege.[61]

In 2000, the Institute of Medicine's Committee on Quality of Health Care in America released a report estimating that preventable medical error causes between 44,000 and 98,000 deaths per year.[62] In addition to pointing out that medical errors were the eighth leading cause of death in the United States,[63] the report noted that the cost of preventable medical errors was approximately $17 billion per year[64] and that most of the errors were not the result of personal recklessness but rather resulted from faulty systems, processes, and conditions.[65] The Committee issued a second report one year later making the same points.[66]

---

[58]Fine, 38 Suffolk U. L. Rev. at 811; Moore, 59 Vand. L. Rev. at 1178; Christina A. Graham, Comment, *Hide and Seek: Discovery in the Context of the State and Federal Peer Review Privileges*, 30 Cumb. L. Rev. 111, 112 (1999-2000) (hereinafter "Graham").

[59]*See* 42 U.S.C.A. §§ 11101-11152 (West 2010).

[60]42 U.S.C.A. § 11111(a).

[61]*See, e.g., Virmani v. Novant Health, Inc.*, 259 F.3d 284, 291-92 (4th Cir. 2001); *see also* Graham, 30 Cumb. L. Rev. at 112.

[62]Institute of Medicine, Committee on Quality of Health Care in America, *To Err Is Human: Building a Safer Health System* 26, 31 (2000) (hereinafter "*To Err Is Human*"), http://www.nap.edu/catalog.php?record_id=9728.

[63]*To Err Is Human*, at 1.

[64]*To Err Is Human*, at 41.

[65]*To Err Is Human*, at 49-66.

[66]Institute of Medicine, Committee on the Quality of Health Care in America, *Crossing the Quality Chasm: A New Health System for the 21st Century* (2001), http://www.nap.edu/catalog.php?record_id=10027.

The Institute's 2000 report prompted additional congressional debate over medical error and provided an impetus for Congress to enact the Patient Safety and Quality Improvement Act of 2005 ("PSQIA").[67]  The PSQIA[68] creates a tightly crafted federal privilege for "patient safety work product"[69] actually reported[70] to a "patient safety organization."[71]  *See* 42 U.S.C. § 299b-22(a).  The purpose of this privilege is to provide "protections [that] will enable all health care systems, including multi-facility health systems, to share data within a protected legal environment, both within and across states, without the threat that the information will be used against the subject providers."[72]  The parties have not addressed, either in their briefs or during oral argument, the extent to which the PSQIA may preempt the privilege in Tenn. Code Ann. § 63-6-219(e).  Accordingly, we will not address this issue in this case.

Today, all fifty states have enacted statutes containing some variation of the peer review privilege.[73]  Despite these efforts, The Joint Commission reported in 2005 that "error remains ubiquitous in health care delivery."[74]

---

[67]*See* Proposed Rules, Dep't of Health & Human Servs., Patient Safety and Quality Improvement, 73 Fed. Reg. 8112, 8112-8113 (Feb. 12, 2008).

[68]Pub. L. No. 109-41, 119 Stat. 424-34 (2005) (codified as amended in scattered sections of 42 U.S.C.).

[69]42 U.S.C. § 299b-21(7).

[70]Patient safety work product that is not actually reported to a patient safety organization is not privileged under the PSQIA.  Charles M. Key, *The Role of PSQIA Privilege in Medical Error Reduction, 21 Health Law* 24, 24 (2008); Kathryn Leaman, *Let's Give Them Something To Talk About: How the PSQIA May Provide Federal Privilege and Confidentiality Protections to the Medical Peer Review Process*, 11 Mich. St. U.J. Med. & L. 177, 192-93 (2007).

[71]42 U.S.C. § 299b-21(4).

[72]Final Rule, Dep't of Health & Human Servs., Patient Safety and Quality Improvement, 73 Fed. Reg. 70732 (Nov. 21, 2008) (effective Jan. 19, 2009).

[73]Am. Med. Ass'n, *Peer Review Privileges and Immunities: A 50 State Survey and Analysis* 4 (2006); *see also The New Wigmore* § 7.8.2, at 1124; Scheutzow, 25 J. L. & Med. at 9; Teresa L. Salamon, Note, *When Revoking Privilege Leads to Invoking Privilege: Whether There Is a Need to Recognize a Clearly Defined Peer Review Privilege in* Virmani v. Novant Health, Inc., 47 Vill. L. Rev. 643, 652 (2002); Brief of Appellant at 24 n.5, *Virmani v. Novant Health, Inc.*, 259 F.3d 284 (4th Cir. 2001), 2001 WL 34110690 (4th Cir. Jan. 8, 2001) (listing every state's peer review statute).

[74]Joint Commission on Accreditation of Healthcare Organizations, *Health Care at the Crossroads:*
(continued...)

**E.**

Finally, even though the peer review statutes enacted in other states are not identical to ours, we have reviewed the decisions construing these statutes to determine whether any other courts have applied their privilege in circumstances similar to those found in this case. As reflected in our review of the history of the peer review statutes in Section IV(D), the focus of the application of privileges akin to Tenn. Code Ann. § 63-6-219(e) has been on the competence and conduct of physicians. The parties have not cited any direct precedents, and our independent research has failed to uncover any decisions, regarding the application of the privilege to a hospital's business decision that affects the quality and cost of patient care.[75]

**V.**

In the final analysis, we return to the principle that statutory privileges should be fairly and reasonably construed to give effect to their intended purpose. However, they need not be broadly or liberally construed because they obstruct the ability of the parties, the courts, and the finders-of-fact to obtain the benefit of otherwise relevant facts. The interpretation of Tenn. Code Ann. § 63-6-219(e) advanced by the defendants in this case knows no reasonable bounds. Virtually all decisions made by hospital committees affect the cost or quality of health care either directly or indirectly. Our review of the language of Tenn. Code Ann. § 63-6-219(e) and its legislative history provides no basis for concluding that the General Assembly set out to shield essentially every decision made by a hospital from appropriately managed discovery in a civil case.

Consistent with Tenn. Code Ann. § 63-6-219(b), the privilege in Tenn. Code Ann. § 63-6-219(e) applies only to peer review proceedings involving a physician's professional conduct, competence, or ability to practice medicine. It covers records possessed by entities that qualify as "peer review committees" under Tenn. Code Ann. § 63-6-219(c), but only when these entities are performing a peer review function. It does not apply to records kept by a hospital in the regular course of its business unrelated to a peer review committee conducting a proceeding involving a physician's professional conduct, competence, or ability

---

[74](...continued)
*Strategies for Improving the Medical Liability System and Preventing Patient Injury* 17 (2005), http://www.jointcommission.org/NR/rdonlyres/167DD821-A395-48FD- 87F9-6AB12BCACB0F/0/Medical_ Liability.pdf.

[75]This question appears to have been presented to the Missouri Court of Appeals in 2002. However, the court pretermitted the issue after it held that the hospital had waived the privilege. *Missouri ex rel. St. John's Reg'l Med. Ctr. v. Dally*, 90 S.W.3d 209, 214 (Mo. Ct. App. 2002).

to practice medicine.[76]  Likewise, it does not apply to records in the custody of original sources who did not prepare the record for use by a peer review committee in a peer review proceeding.[77]

In order to determine whether the privilege in Tenn. Code Ann. § 63-6-219(e) applies to a particular circumstance, the courts must determine whether the records sought to be discovered arose from a peer review proceeding to which the privilege applies.  Tenn. Code Ann. § 63-6-219(c) does not explicitly define a peer review proceeding.  However, its meaning emerges from the statute's pentimento that remains visible notwithstanding the broad brush strokes of the later amendments.  In accordance with Tenn. Code Ann. § 63-6-219(b), a peer review proceeding is a proceeding involving a physician's professional conduct, competence, or ability to practice medicine.

Limiting the privilege in Tenn. Code Ann. § 63-6-219(e) to peer review proceedings involving a physician's professional conduct, competence, or ability to practice medicine provides a bright line of demarcation between records relating to peer review proceedings involving physicians that are privileged and other records made in the regular course of the hospital's business that are not privileged under Tenn. Code Ann. § 63-6-219(e).  It is also consistent with the broad definition of "peer review committee" in Tenn. Code Ann. § 63-6-219(c) because it allows the privilege to apply to any hospital committee that fits within the statutory definition of "peer review committee," as long as the committee is engaging in a peer review proceeding which, consistent with Tenn. Code Ann. § 63-6-219(b), involves a physician's professional conduct, competence, or ability to practice medicine.

## VI.

Using these principles, we now consider, based on the evidence in this record, (1) whether the decision with regard to the provision of vascular access services is a peer review proceeding for the purpose of Tenn. Code Ann. § 63-6-219(e), (2) whether the Bard Report was a record prepared for use by a peer review committee in a peer review proceeding, and (3) whether the Tri-Star CNO Council and the Tri-Star CFO Council are peer review committees under Tenn. Code Ann. § 63-6-219(c) that were conducting peer review proceedings.

---

[76]*Powell v. Community Health Sys., Inc.*, ___ S.W.3d ___, ___ (Tenn. 2010) (released contemporaneously with this opinion).

[77]*Stratienko v. Chattanooga-Hamilton County Hosp. Auth.*, 226 S.W.3d at 286.

-25-

**A.**

We turn first to the status of the TriStar CNO Council, the TriStar CFO Council, and the Hendersonville Medical Center's Quality Management Committee. Hospitals have not limited themselves to using statutorily defined terms to name their peer review committees. Accordingly, determinations whether a particular hospital committee fits within the definition of "peer review committee" in Tenn. Code Ann. § 63-6-219(c) depends on the committee's purpose and functions, not its name. A committee may be deemed to be a peer review committee for the purpose of Tenn. Code Ann. § 63-6-219(c) even if it is not called a "peer review committee."

As a result of the numerous amendments to Tenn. Code Ann. § 63-6-219(c) over the years, a peer review committee is now defined, among other things, as "any committee . . . of any licensed health care institution . . . the function of which, or one (1) of the functions of which, is to evaluate and improve the quality of health care rendered by providers of health care service[s]." It is difficult to imagine any committee created by a hospital whose functions do not include evaluating and improving the quality of care provided to patients at the hospital.

In light of this broad definition of "peer review committee," the trial court correctly concluded in its June 5, 2008 order that the TriStar CNO Council, the TriStar CFO Council, and the Hendersonville Medical Center's Quality Management Committee were peer review committees as defined in Tenn. Code Ann. § 63-6-219(c). This conclusion, however, does not end the inquiry. Because particular hospital committees may play more than one institutional role, we must also determine whether the TriStar CNO Committee, the TriStar CFO Committee, and the Hendersonville Medical Center's Quality Management Committee where engaging in a peer review function when they received and considered the Bard Report and the other disputed records.

**B.**

A peer review proceeding for the purpose of Tenn. Code Ann. § 63-6-219(e) is one that involves the evaluation and review of a physician's professional conduct, competence, and ability to practice medicine. The three committees that reviewed the Bard Report were considering whether the TriStar Health System should stop outsourcing the provision of vascular access services at its hospitals. These proceedings were not peer review proceedings for the purpose of Tenn. Code Ann. § 63-6-219(e) because they did not involve a physician's professional conduct, competence, or ability to practice medicine.

The subject of the Bard Report did not involve the professional conduct, competence, or ability to practice medicine of any physician. Thus, even though the TriStar CNO Council, the TriStar CFO Council, and the Hendersonville Medical Center's Quality Management Committee fit within the broad statutory definition of "peer review committee," they were not engaged in a peer review proceeding when they considered the Bard Report. Accordingly, the trial court's orders of June 5, 2008 and July 21, 2008, applying the privilege in Tenn. Code Ann. § 63-6-219(e) to the Bard Report are in error.

## VII.

In light of our decision that the consideration of whether to stop outsourcing the provision of vascular access services was not a peer review proceeding for the purpose of Tenn. Code Ann. § 63-6-219(e), we need not address at length Lee Medical's assertions that the privilege in Tenn. Code Ann. § 63-6-219(e) does not apply to Bard or to Mses. Alsbrooks and Chambers. We have addressed this issue in *Powell v. Community Health Systems, Inc.*, ___ S.W.3d at ___ , where we held that third parties who prepare and submit information to a peer review committee at its request and in the discharge of its peer review functions should not be considered "original sources" for the purpose of Tenn. Code Ann. § 63-6-219(e).

## VIII.

Finally, we turn to Lee Medical's argument that the trial court should have permitted broader discovery in order to substantiate its claim that Bard, All About Staffing, and Mses. Alsbrooks, Chambers, and Philpott knowingly furnished false information, derogatory to Lee Medical's performance, to the TriStar CNO Committee and the TriStar CFO Committee. Lee Medical's reliance on *Eyring v. Fort Sanders Parkwest Medical Center* for this argument is misplaced. This decision found an implied exception to the privilege in Tenn. Code Ann. § 63-6-219(e), based upon the requirements of Tenn. Code Ann. § 63-6-219(d)(3), regarding information regarding the good faith, malice, or knowledge of a member of the peer review committee. *Eyring v. Fort Sanders Parkwest Med. Ctr.*, 991 S.W.2d at 239. In this case, Lee Medical is asserting malice, not on the part of members of any of the peer review committees, but by the persons who provided information to the peer review committees. Because we have already determined that the consideration of whether to stop outsourcing the provision of vascular access services was not a peer review proceeding for the purpose of Tenn. Code Ann. § 63-6-219(e), we have determined that the resolution of this issue should await a more appropriate case.

## IX.

The discovery orders of the trial court are vacated to the extent that they are inconsistent with this opinion, and the case is remanded to the trial court for further proceedings. In considering any other issues regarding the discovery of records possessed by the defendants and non-parties, the trial court may and should make appropriate provisions to assure that all personal medical information made private and confidential under federal and state law is not inadvertently, inappropriately, or improperly released. The costs of this appeal are taxed, jointly and severally, to Bard Access Systems, Inc. and All About Staffing, Inc. The portion of the costs associated with the filings of the Tennessee Hospital Association as amicus curiae are hereby taxed to the Tennessee Hospital Association.

_____
WILLIAM C. KOCH, JR., JUSTICE

**APPENDIX**

Tenn. Code Ann. § 63-6-219 (Supp. 2009) provides:

(a) This section shall be known and may be cited as the "Tennessee Peer Review Law of 1967."

(b) (1)  In conjunction with the applicable policies of the Health Care Quality Improvement Act of 1986, 42 U.S.C. §§ 11101-11152, it is the stated policy of Tennessee to encourage committees made up of Tennessee's licensed physicians to candidly, conscientiously, and objectively evaluate and review their peers' professional conduct, competence, and ability to practice medicine. Tennessee further recognizes that confidentiality is essential both to effective functioning of these peer review committees and to continued improvement in the care and treatment of patients.

(2)  As incentive for the medical profession to undertake professional review, including the review of health care costs, peer review committees must be protected from liability for their good-faith efforts. To this end, peer review committees should be granted certain immunities relating to their actions undertaken as part of their responsibility to review, discipline, and educate the profession. In instances of peer review committees examining the appropriateness of physicians' fees, this immunity must also extend to restraint of trade claims under title 47, chapter 25.

(c) As used in this section, "medical review committee" or "peer review committee" means any committee of a state or local professional association or society, including impaired physician peer review committees, programs, malpractice support groups and their staff personnel, or a committee of any licensed health care institution, or the medical staff thereof, or a medical group practice, or any committee of a medical care foundation or health maintenance organization, preferred provider organization, individual practice association or similar entity, the function of which, or one (1) of the functions of which, is to evaluate and improve the quality of health care rendered by providers of health care service to provide intervention, support, or rehabilitative referrals or services, or to determine that health care services rendered were professionally indicated, or were performed in compliance with the applicable standard of care, or that the cost of health care rendered was considered reasonable by the providers of professional health care services in the area and includes a committee functioning as a utilization review committee under the

-29-

provisions of Public Law 89-97 (42 U.S.C. §§ 1395-1395pp) (Medicare Law), or as a utilization and quality control peer review organization under the provisions of the Peer Review Improvement Act of 1982, Public Law 97-248, §§ 141-150, or a similar committee or a committee of similar purpose, to evaluate or review the diagnosis or treatment or the performance or rendition of medical or hospital services that are performed under public medical programs of either state or federal design.

(d) (1) All state and local professional associations and societies and other organizations, institutions, foundations, entities and associated committees as identified in subsection (c), physicians, surgeons, registered nurses, hospital administrators and employees, members of boards of directors or trustees of any publicly supported or privately supported hospital or other such provider of health care, any person acting as a staff member of a medical review committee, any person under a contract or other formal agreement with a medical review committee, any person who participates with or assists a medical review committee with respect to its functions, or any other individual appointed to any committee, as such term is described in subsection (c), is immune from liability to any patient, individual or organization for furnishing information, data, reports or records to any such committee or for damages resulting from any decision, opinions, actions and proceedings rendered, entered or acted upon by such committees undertaken or performed within the scope or function of the duties of such committees, if made or taken in good faith and without malice and on the basis of facts reasonably known or reasonably believed to exist. Such immunity also shall extend to any such entity, committee, or individual listed in this subsection (d) when that entity, committee, or individual provides, or attempts to provide, assistance directly related to and including alcohol or drug counseling and intervention through an impaired professional program, or if none, through a requesting professional society, to any title 63 licensee, or applicant for license. Physicians health programs and physicians health peer review committees shall be immune from liability for providing intervention, referral, and other support services to the minor children or spouse or both of physicians.

(2) Notwithstanding the provisions of subdivision (d)(1), any person providing information, whether as a witness or otherwise, to a medical review committee regarding the competence or professional conduct of a physician is immune from liability to any person, unless such information is false and the person providing it had actual knowledge of such falsity.

(3) A member of a medical review committee, or person reporting information to a medical review committee, is presumed to have acted in good faith and without malice. Any person alleging lack of good faith has the burden of proving bad faith and malice.

(e) All information, interviews, incident or other reports, statements, memoranda or other data furnished to any committee as defined in this section, and any findings, conclusions or recommendations resulting from the proceedings of such committee are declared to be privileged. All such information, in any form whatsoever, so furnished to, or generated by, a medical peer review committee, shall be privileged. The records and proceedings of any such committees are confidential and shall be used by such committee, and the members thereof only in the exercise of the proper functions of the committee, and shall not be public records nor be available for court subpoena or for discovery proceedings. One (1) proper function of such committees shall include advocacy for physicians before other medical peer review committees, peer review organizations, health care entities, private and governmental insurance carriers, national or local accreditation bodies, and the state board of medical examiners of this or any other state. The disclosure of confidential, privileged peer review committee information to such entities during advocacy, or as a report to the board of medical examiners under § 63-6-214(d), or to the affected physician under review, does not constitute either a waiver of confidentiality or privilege. Nothing contained in this subsection (e) applies to records made in the regular course of business by a hospital or other provider of health care and information, documents or records otherwise available from original sources are not to be construed as immune from discovery or use in any civil proceedings merely because they were presented during proceedings of such committee.

(f) If any provisions of this section, or the application thereof to any person or circumstance is held invalid, such invalidity shall not affect other provisions or applications of this section that can be given effect without the invalid provision or application, and to that end the provisions of this section are declared to be severable.