# IN THE COURT OF APPEALS OF TENNESSEE
## AT NASHVILLE
March 5, 2025 Session

## IN RE CONSERVATORSHIP OF PATRICIA L. CAPELLI

**Appeal from the Chancery Court for Rutherford County**
**No. 14CV-1177      Darrell Scarlett, Judge**

_____

### No. M2024-00684-COA-R3-CV
_____

This appeal arises from a long-standing conservatorship, which was created in 1981. The primary issues pertain to the fees the conservator is entitled to receive for the various services she renders in administering the estate of the conservatorship and services the conservator renders as one of the caretakers for the ward, Patricia L. Capelli (hereinafter "Ms. Capelli"). Following an evidentiary hearing on the conservator's fee applications for services rendered, the trial court bifurcated the conservator's rate of compensation for caregiving as distinguished from management of the conservatorship. The court reduced the hourly rate of compensation for caregiving services to $25 per hour while allowing the conservator to be compensated at the rate of $115 per hour for services rendered in the management of the conservatorship, the rate the court had previously authorized for all services. The court also reduced the total hours claimed for both types of services. The court then ruled that, going forward, the conservator's rate of compensation for any services would be $25 per hour. This appeal followed. We affirm the bifurcation of the rate of compensation for service previously rendered. However, finding this to be a complex conservatorship case, we modify the fee schedule going forward and hold that the conservator shall be paid the previously authorized rate of $115 per hour for services rendered in the management of the conservatorship but affirm the rate of compensation of $25 per hour for caregiving services rendered by the conservator. We also modify the trial court's decision to disallow blocks of time for the caregiving services billed by the conservator. Further, we find that the conservatorship shall pay the reasonable and necessary attorney's fees and costs incurred by the conservator in this appeal but not the attorney's fees and costs incurred by Joseph Capelli. We also remand for the court to consider the applicable law and relevant facts regarding the construction of a pool on Ms. Capelli's property. Thus, we remand this case to the trial court for further proceedings consistent with this decision.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Chancery Court**
**Affirmed in Part; Modified in Part; and Remanded**

FRANK G. CLEMENT JR., P.J., M.S., delivered the opinion of the court, in which ANDY D. BENNETT and CARMA DENNIS MCGEE, JJ., joined.

Gary D. Beasley, David O. Haley, Murfreesboro, Tennessee, for the appellants, Catherine Viers and Jeffrey W. Viers.

G. Sumner R. Bouldin Jr., Murfreesboro, Tennessee, for the appellee, Joseph J. Capelli Jr.

Mark Allen Polk, Murfreesboro, Tennessee, attorney ad litem.

Bonita Tucker, Murfreesboro, Tennessee, guardian ad litem.

## OPINION

### FACTS AND PROCEDURAL HISTORY

The conservatorship for Ms. Capelli was established in the Atlantic County Chancery Court of New Jersey in 1981 after she sustained traumatic and permanent brain injuries in a vehicular accident involving a tractor-trailer truck. Ms. Capelli's parents, Joseph Capelli, Sr., and Anna M. Capelli, were appointed co-conservators.

After the accident, Ms. Capelli was comatose for weeks and remained in the hospital for the better part of a year. Then after regaining consciousness, she had to relearn how to talk, walk, eat, and control her bladder. And she continues to have difficulty with short-term memory. As time passed, Ms. Capelli required a walker or cane and assistance to ambulate, but her ability worsened to where she is wheelchair-bound and requires assistance to negotiate steps to enter and exit her home. She requires assistance to enter or to exit a vehicle and the assistance of an aquatic therapist to utilize a swimming pool. She also requires assistance in eating and personal care and hygiene.

Her parents, in the capacity as her co-conservators, entered into a favorable settlement agreement with the responsible parties involved in the vehicular accident, pursuant to which a substantial down payment of over three million dollars was remitted to the conservatorship as partial compensation for Ms. Capelli's injuries. The settlement agreement also provided reimbursement of Ms. Capelli's current and future medical and caregiver expenses for the remainder of her life, to be administered by Chubb Insurance. Ms. Capelli's other expenses and those of the conservatorship are paid from the estate of the conservatorship, subject to court approval.

In November 2004, the New Jersey court added Catherine Viers, Ph.D., one of Ms. Capelli's siblings, as a co-conservator along with the parents. Then, on December 28, 2004, with court approval, the conservators moved Ms. Capelli to Tennessee to reside with Dr. Viers, Dr. Viers's husband, and their two children while the New Jersey court retained

- 2 -

jurisdiction over the conservatorship. On February 18, 2015, oversight of the conservatorship was officially transferred to the Rutherford County Chancery Court, where it remains.

Ms. Capelli resided rent-free in the home of Dr. Viers's family for several years. Then, Anna Capelli and Dr. Viers, the co-conservators,[1] filed a petition recommending that the conservatorship purchase a home that was more suitable based on her disabilities, which were adversely impacted by recent back surgery that further impaired Ms. Capelli's ability to use the facilities in Dr. Viers's home. The court appointed a guardian ad litem ("GAL") to investigate the conservators' recommendation and make a report. The GAL recommended the purchase of a home located at 1519 Bradberry Drive in Murfreesboro along with the proposed handicap upgrades. The GAL also recommended the purchase of an adjoining vacant lot for the construction of a therapeutic pool, which the GAL found to be in the best interest of Ms. Capelli. However, the GAL recommended that several appraisals be obtained and submitted prior to the approval of the construction of a pool.

The court approved the purchase with Ms. Capelli's assets of the Bradberry Drive property and the adjoining vacant lot, both of which were titled in the name of Ms. Capelli's conservatorship. The recommended handicap renovations were also approved except for the construction of the pool, which was reserved until the co-conservators submitted three appraisals on the cost of the pool. The court also approved the co-conservators' proposed property management plan. Ms. Capelli has resided with Dr. Viers and her family in the Bradberry Drive property since the renovations were completed in late 2015.

Following the purchase of the Bradberry Drive properties, the value of which exceeds one million dollars,[2] Ms. Capelli still has liquid assets in excess of $7.1 million that are managed by McPeak Investments under the supervision of Dr. Viers as conservator and subject to court approval. And as noted above, Ms. Capelli's medical and caregiver expenses are paid by Chubb Insurance pursuant to the settlement of the vehicular accident, while Dr. Capelli's other expenses and those of the conservatorship are paid from the estate of the conservatorship, subject to court approval.

On April 29, 2016, the Rutherford County Clerk and Master filed a motion for a status conference regarding various issues. Contemporaneously, Dr. Viers filed a motion for approval of her fees. She was seeking $32,672.50 for work performed from January 1, 2015, to July 30, 2015, and $26,238.00 for work performed in 2014. She was also seeking $10,000.00 to be paid to co-conservator Anna Capelli (the ward's mother). A hearing was

---

[1] Co-conservator Joseph Capelli Sr. passed away in February 2011.

[2] The value of the two properties is estimated to have a combined value to of $1,000,000.00 to $1,250,000.00.

held on May 9, 2016, regarding the pending motions. In the June 14, 2016 order that followed, the trial court found in pertinent part:

> 1. Upon the testimony of Catherine Viers, **this conservatorship involves a complex case** that requires a substantial amount of Catherine Viers' time, including but not limited to, managing and overseeing five employees, filing taxes, filing accounting of medical expenses for insurance reimbursement, filing accountings with the court, overseeing substantial assets, overseeing the healthcare and well-being of the ward, scheduling and attending appointments with ward's multiple health care providers, managing medications, consulting with legal professionals, as well as other time demanding concerns.
>
> 2. Upon Catherine Viers' testimony, Dr. Viers is a licensed professional psychologist with a current bill rate of $115.00 per hour. However, the time demands as Co-Conservator have reduced the amount of hours she can spend practicing her occupation by 80%.
>
> 3. Upon the testimony of Jeffrey Viers, the Viers family sole reason for living at ward's residence is for the care and well-being of the ward. **Without the Viers family's supervision, the ward could not reside at her home even with employment of 24-hour caregivers. Without the Viers's supervision, ward would be forced to live in an assisted living facility.** Prior to living in the ward's residence, the ward resided in the Viers' home. Mr. Viers testified that due to the ward's declining health, the ward needed a new residence which was more easily accessible for the Ward. Mr. Viers further testified that the mortgage on the Viers' home was nearly paid off. But for these facts and circumstances, the Viers family would have remained in their home.

(Emphasis added).

Based upon these and other findings, the court approved Dr. Viers's fee requests and approved an annual fee for co-conservator Anna Capelli of $10,000.[3] It also required

---

[3] Anna Capelli died in 2017. As a result, Anna Capelli was removed as a co-conservator by order entered on September 13, 2017. Because Dr. Viers became the sole conservator by default, the court appointed her husband, Jeffrey Viers, as co-conservator to be able to serve in the event that Dr. Viers should be incapacitated or unavailable. Although Jeffrey Viers resides in the home and assists with the care of the ward, Dr. Viers has performed essentially all official conservator duties and is the only conservator to request fees following her mother's death in 2017. Thus, our analysis focuses solely on the services rendered by Dr. Viers and the fees to be paid for her services.

that the Viers family make a monthly contribution of $730 to reside in the ward's home, which represented 75% of the estimated monthly utilities costs.

In a subsequent motion filed on November 28, 2016, Dr. Viers submitted a request for the approval of conservator's fees of $40,102.50 for the period of August 1, 2015, through April 30, 2016. The clerk and master filed a report regarding the motion, and Dr. Viers filed a response to the clerk and master's report. On March 7, 2017, the court approved a fee of $39,877.50 based upon the hourly rate of $75 per hour.

In a fee motion filed on August 21, 2017, Dr. Viers requested that her fees be approved for the period of May 1, 2016, through and including December 31, 2016, in the amount of $32,872.50 at the rate of $75.00 per hour. Those fees were approved on September 28, 2017.

Then on July 2, 2018, Dr. Viers filed a motion requesting that her fees be approved for the period of January 1, 2017, through and including December 31, 2017, in the amount of $55,965.00 at the rate of $75.00 per hour. Those fees were approved by order entered on August 8, 2018.

In a motion filed on February 11, 2019, Dr. Viers requested that her fees be approved for the period of January 1, 2018, through December 31, 2018, in the amount of $66,277.50 at the rate of $75.00 per hour. Those fees were approved by order entered on March 8, 2019.

Thereafter, Dr. Viers, who has a doctorate degree and is a licensed counseling psychologist in the state of Tennessee with a health service provider designation, filed a motion requesting that she be allowed to increase the hourly rate she charged as the conservator from $75 per hour to $115 per hour. The request was based in part upon Tennessee Code Annotated § 34-1-112 which states, "a conservator may receive a reasonable compensation for the services rendered to the ward." Another basis for the request was that Dr. Viers was precluded from working full-time in her private psychology practice due to the requirements of her service as conservator, noting that she charged $115 per hour for counselling and $150 for intake. The motion also noted the statutory factors in § 34-1-112 that a court shall consider when approving compensation: 1) the complexity of the ward's property; 2) the amount of time the conservator spends performing duties to the ward; 3) the time deprived from the conservator's normal occupation; 4) whether the conservator would be obligated to provide those services if a fiduciary was not needed; and 5) other matters the court deems appropriate. *See* Tenn. Code Ann. § 34-1-112(a).

In support of this filing, Dr. Viers stated:

1. The ward's estate has grown considerably, which requires the conservator to spend more time on financial aspects of conservatorship.

2. The ward's health has deteriorated since 2017. The ward currently needs more assistance from the conservator as well as healthcare employees. The ward now needs twenty-four hour assistance, seven days a week. These increased demands requires more time from the conservator to care for the ward and to manage the employees. The conservator must schedule five employees to constantly tend to the ward. When employees become unreliable or quit, the conservator must find replacement employees. This is an unending task. Managing the caregivers is equivalent to running a business staffing 8760 man hours a year. In addition to staffing concerns, the conservator must attend to medical decisions as well as personal needs of the ward.

3. The increased time demands prevent the conservator from engaging in her normal occupation as a counseling psychologist. The conservator is currently seeing patients less than a full day per week. The conservator is a well-trained licensed psychologist that had built a viable practice over the past twenty-five years. The conservator normally bills patients One Hundred Fifteen Dollars ($115) per hour during treatment and One Hundred Fifty Dollars ($150) per hour for intake evaluations. The conservator is foregoing her chosen profession and most of her income to serve as conservator.

4. As sister of the ward, the conservator has no legal obligation to provide these services. The conservator provides valuable and necessary care for the ward.

5. The ward's estate is financially secure and continues to grow as shown in recent accountings. The ward can afford to pay the conservator a more reasonable hourly late. Moreover, the conservator's personal life requires a more fair compensation. The conservator's two daughters are simultaneously in college. The conservator needs to contribute to educational costs of her family. The conservator would be able to meet the financial demands if she was not serving as conservator. Therefore, the conservator's current approved rate is no longer reasonable.

(Footnote omitted).

Dr. Viers's motion was heard on October 31, 2019. In the order that followed, the court approved the fee increase from $75 per hour to "One Hundred Fifteen Dollars ($115.00) beginning October 31, 2019 forward."[4]

Because the new fee rate did not begin until October 31, Dr. Viers submitted a fee request at a rate of $75.00 per hour for the period from January 1, 2019, through and including October 30, 2019, totaling $53,340.00, and a separate fee request for the period from October 31, 2019, through January 31, 2020, at a rate of $115.00 per hour, requesting $27,772.50 in fees for that period. Both requests were approved on March 2, 2020, for a total amount of $81,112.50.

In a motion filed on March 3, 2021, Dr. Viers requested that her fees be approved for the period of February 1, 2020 through December 31, 2020 in the amount of $132,848.00.

On March 23, 2021, the clerk and master filed a report of the clerk and master in response to the conservator's motion for fees stating, inter alia, that the clerk and master had issues with the conservator's billing for a renovation of the ward's residence that had not been approved by the court.

Dr. Viers filed a response to the clerk's report and a notice of status update on investments on March 27, 2021, which showed that the current market value of the investments of the conservatorship at that time was $6,365,806.00. The next day she also filed a motion for court approval of home improvements already completed and a motion to revise the property management plan. The court responded by appointing attorney Mark Polk as the attorney ad litem for the ward to, inter alia, review Dr. Viers's conservator fee requests and the recent remodeling to determine if they were necessary, reasonable, and a benefit to the ward.

Mr. Polk filed his report on August 16, 2021. In part, he recommended consideration of hiring an agency to manage and provide caregivers for Ms. Capelli instead of Dr. Viers doing so to possibly save the conservatorship money. Mr. Polk also questioned why the fees for caregiving provided by Dr. Viers were not submitted to Chubb Insurance for reimbursement, noting that except for Dr. Viers, all other caregiver expenses were submitted to Chubb Insurance for reimbursement. Mr. Polk also noted that Dr. Viers had performed renovations in the home, including painting, replacement of flooring and kitchen cabinets, without obtaining prior court approval. Dr. Viers filed a response to Mr. Polk's report on August 18, 2021.

---

[4] The order reads: "Having reviewed said Motion, hearing testimony from Conservator and being otherwise sufficiently advised the Court ORDERS, ADJUDGES and DECREES that the hourly rate of the Co[n]servator, Catherine C. Viers, shall be increased to One Hundred Fifteen Dollars ($115.00) beginning October 31, 2019 forward."

In the interim, Joseph J. Capelli Jr., brother of the ward and Dr. Viers, notified the court that he objected to Dr. Viers's fees and other expenditures and wanted to be served with copies of all fee requests and other court filings. As a result, the trial court required Dr. Viers to serve a copy of her fee motions and the account statements on Mr. Capelli and other interested parties or siblings. Dr. Viers did so.

In an order entered on August 27, 2021, the court approved a partial fee payment of $50,000 toward the fee request of $132,848 and ordered the attorney ad litem to further investigate whether an agency handling the daily care of the ward would save the conservatorship money and to look into Dr. Viers's fee requests and expenditures. On April 4, 2022, Mr. Polk filed a report and statement of issues for trial.

On July 12, 2022, the day before the pending issues were to be heard by the court, Joseph Capelli filed "Objection to Co-Conservator's Request for Payment and Motion to Intervene as Interested Party, to Remove Co-Conservators, and to Appoint Third-Party Professional Conservator for the Benefit of the Ward." As a result, the hearing was continued, and the court allowed the intervention.

Then, on July 22, 2022, Mr. Capelli filed a petition to remove Dr. Viers as conservator and to modify the conservatorship. Mr. Capelli alleged, inter alia, that Dr. Viers's charges were excessive as to hourly rate, that the requested fees were exorbitant for the services rendered, that they were not for the benefit of the ward, that there was a conflict of interest between Dr. Viers and the ward, and that Dr. Viers was using the assets of the ward for Dr. Viers's family's benefit. Dr. Viers filed an answer on August 22, 2022.

Thereafter, Dr. Viers filed multiple motions for conservator fees, specifically for the periods from January 1, 2021 through June 30, 2021; July 1, 2021 through December 31, 2021; January 1, 2022 through June 30, 2022; July 1, 2022 through December 31, 2022; and January 1, 2023 through December 31, 2023.

A trial on all outstanding issues was held on March 6 and 7, 2024. The issues tried included those raised by Mr. Polk, Joseph Capelli's petition and objections, and all pending fee motions and accounting issues.

Dr. Viers presented four witnesses in her case-in-chief: (1) Neil McPeak, the financial manager of the conservatorship's investments; (2) Genara Sariel, affectionately known as "Clara Bell," who has been the primary caregiver for Ms. Capelli for the last 18 years; (3) Rose Ann Mosey, an aquatic therapist for Ms. Capelli for the last 10 years; and (4) Dr. Viers. Joseph Capelli testified as a witness in his case-in-chief. The attorney ad litem and guardian ad litem attended the hearing and cross-examined the witnesses.

Dr. Viers testified that she and Ms. Capelli, who was 61 years old at the time of trial, grew up together, were closest siblings, best friends, and did everything together. After graduating from high school, Ms. Capelli was attending nursing school, and "[o]n the way home from nursing school, the car she was riding in was struck by a tractor trailer, and she sustained a traumatic brain injury along with other injuries." Dr. Viers explained that her sister was

> in the hospital for the better part of a year after this accident. So she was comatose for a period of time. She slowly regained consciousness. She had to relearn how to talk, how to walk, how to eat, how to control her bladder. She had to relearn everything. And some things she's just never been the same. So because of her severe traumatic brain injury, she has much difficulty with short-term memory. She has difficulties with balance. She has difficulties with executive functions, like impulse control. She's not able to plan. She's not able to think ahead. She's not able to -- I mean, she can't drive a car. There's a lot of things she can't do.

>                 .        .        .

> She has much difficulty with fine motor control. So, for example, she can use a fork to feed herself, but if she was eating a salad, it would be difficult for her to get the lettuce on her fork. And so a lot of times we kind of load the fork for her and hand it to her so that she doesn't get frustrated and drop her food on herself which makes her very frustrated.

>                 .        .        .

> So sometimes she does try to get too much food in her mouth at one time and she has choked.

Dr. Viers further explained that her sister requires personal assistance to help wipe following a bowel movement to make sure she's clean. However, Ms. Capelli's communication skills are good: "She likes to talk. She likes to be part of any conversation." As for activities and socialization, Dr. Viers explained:

> So, if you're . . . having a conversation, she's going to chime in and give you her two cents. She has opinions. She has strong opinions. She wants to be included. She, you know, she can voice her opinions, her wishes, her needs. She will tell you if she likes you or she doesn't like you. She will tell you what she wants to do and she always wants to do something. She always wants to be active and go places. She hates staying home. She loves to be around the family, around our dogs. She has great delight in my children and our family dog. My husband was telling me, I had to be out of the house last

night, and he said, Patty asked for you every ten minutes. Where is Cathy? When is she coming home? Where is she? And then ten minutes later, Where is Cathy? When is she coming? And when I'm at work if he is home or if I'm home with her, she's saying, Where is Jeff? When he's [sic] coming home? A car just went by. Is that your husband? So she's always looking for us.

Dr. Viers explained how the reimbursements for caregiver costs are handled by the insurance company:

I submit receipts for medical expenses to the insurance company. It's very detailed. I have to not only itemize how much each caregiver made but what activities they performed while they were in the home. And so we have sheets that they fill out that they check off, like, did they give her a bath? Did they help her with her medication? Did they give her a meal? Did they take her somewhere in the car? Did she go on an activity? So there's a lot of paperwork involved, but I submit that to Chubb and they reimburse every penny of any medical expense that is not covered by Medicare or Tricare which are Patty's two primary health insurances. She has both of those health insurances. The majority of the money that I spend to provide for Patty's medical care is caregiver money. And all of that comes back whenever I file it. And the amount for, like, medicines or doctor visits, that's very minimal because Medicare and Tricare is paying those expenses.

Dr. Viers testified about her work in getting the accountings prepared each year. She stated:

Well, I work with a CPA and he keeps track on a program, QuickBooks. He keeps track of all of the expenses. So whenever she has a bill to pay, it goes through the CPA. They keep track of all of those expenses. And so when I have an accounting I tell him, okay, I need this accounting by this date. He starts working on it. He does everything he can do. Then I take it and review everything on it. And then I give it to you [Dr. Viers's attorney]. And you review it. And then you give it back to me. And then we submit it to the Court.

Q. And we're actually talking about 5- or 600 pages of documents, correct?

A. Yes. So, to be more specific, there's every bank statement, every investment statement, every page of that, every expense, every caregiver expense, every medical expense. I mean, it's just -- the home, everything is on there, all of her assets, everything.

.    .    .

- 10 -

Q. And up to now, of course, the 2019-2020 accounting remains. All of those up until June of 2023 would be the last time period. All of those accountings are still owed but everything before 2019, 2020 has been approved by the courts, correct?

A. Correct.

Neil McPeak, the investment manager of the financial accounts, stated that the account has grown approximately $3,895,000 from inception and that the account is presently worth around $7.1 million. He also stated that there had never been any encroachment on the investments except for the purchase of the house for Ms. Capelli in Murfreesboro, which Mr. McPeak considered to be a wise investment because it diversified the portfolio.

Mr. McPeak opined that with current cash flow projections,[5] based upon a conservative estimate of five percent return on investment, he valued the future estate of the conservatorship in 2052 at over $11,000,000, assuming effective management and investment of the funds, noting that the conservatorship receives from Chubb Insurance significant financial benefits in the form of insurance reimbursement for Ms. Capelli's medical and caregiver expenses.

---

[5] Explaining his projection, Mr. McPeak stated that he took a worst-case scenario number, picking a high expenditure number "so it stays as realistic as possible" and a conservative income number:

> Then to the right-hand column I wanted to illuminate what the corpus would be remaining if you were to spend 250 [thousand dollars] a year. That number is extremely inflated because, number one, [the annual expenses are] not that much. Number two, a large amount of these expenses are reimbursed [by Chubb]. I didn't know exactly what that number was, but I was trying to [provide] an idea of what the future values could be, you know, in this portfolio under rather, in my opinion, draconian assumptions, you know, that the expenses would go that high.
>
> I even took it -- on the next page I took it to one step further, and I went to $300,000 in terms of expenses. So, if we went to $300,000 of expenses, again, made 5 percent on the 7.1, and took the differential out, you know, at 7.1, there would still be approximately $11 million in the account. Both of these are extremely conservative because the expenses, number one, are a lot less than that. And, number two, a large amount of those are reimbursed.
>
> .        .        .
>
> Taking history, we've returned over 5 percent going almost 20, 30 years. If you take this portfolio and you do, in fact, study technically a Monte Carlo simulation, the actual regrowth rate of this portfolio is around 6.1, 6.2 [percent]. So 5 percent, in my opinion, is a reasonable rate of return, reasonable assumption.

The primary caregiver, Genara Sariel, testified that she had worked for eighteen years as one of Ms. Capelli's caregivers. She typically worked a full-time schedule from 8:00 a.m. until 4:00 p.m. during the day, Monday through Friday. She also worked overnight three nights per week. During the overnight stays she would stay in Ms. Capelli's room to do anything needed such as take her to the bathroom. She testified that other caregivers provided the same service on the other nights. Ms. Sariel testified that she was hired and supervised by Dr. Viers and currently receives $25.00 per hour in compensation plus health insurance benefits.

Ms. Sariel testified that she helps Ms. Capelli clean up and shower, interacts consistently with her both as caregiver and companion, makes her meals, does her laundry, takes Ms. Capelli to medical appointments, church, the mall, movies, and to her massage therapist. Ms. Sariel stated that during the Covid pandemic she worked her regular schedule consisting of 60 to 74 hours out of 168-hour week, but because Dr. Viers had difficulty finding other caregivers, Ms. Sariel worked the remaining hours, approximately 100 hours per week, during the pandemic.

Following the conclusion of the trial, the court scheduled a subsequent hearing for March 18, 2024, during which it stated its findings of fact and rulings from the bench. Its final order was entered on April 10, 2024, which incorporated the court reporter's transcript of the proceedings that set forth the court's findings and rulings.

Contrary to the earlier finding by the court that this was "a complex conservatorship," the court ruled that this was "not a complex case." The order also states that the court "does not interfere in any way with [Dr. Viers's] current methods of providing caregivers for the ward." Nevertheless, the court retroactively bifurcated the rate of compensation for Dr. Viers's services by compensating her at the rate of $25 per hour for "caregiving" services and at the rate of $115 per hour for conservatorship or management services. The court also disallowed blocks of time for both types of services based on a close review of the services rendered.

Moreover, going forward, the court announced that Dr. Viers's hourly rate of compensation for both caregiving duties and management services would be $25.00 per hour instead of the previously authorized rate of $115 per hour.[6]

The court also provided a detailed analysis of each of the pending fee applications and identified which services and blocks of time were compensable and which were disallowed. For example, in its assessment of Dr. Viers's caregiving services set forth in one of the fee applications, the court stated:

---

[6] As part of its reasoning for this change, the court eliminated the previous requirement that Dr. Viers pay $730 per month as a contribution to the household expenses, which had been established in 2014.

Then I get to February 6. And this same issue is going to arise throughout in a lot of these entries. Total care, 4:00 to 9:00. And I understand the caregiver wasn't able to be there. But that's been charged 5 hours at $115 an hour. And that 5 hours is not conservatorship work. A lot of that is caregiving work, and a lot of it's nothing. If you're sitting there in the house that you live in for 5 hours, then I understand you've got to get up and help her to the bathroom, get her something to eat, do whatever has to be done, particularly in that 4:00 to 9:00, because she's going to eat supper. But that's caregiving stuff. That's not conservatorship. Plus, when you're just sitting there watching TV with your sister, that's not even caregiving. That's sitting in your house watching TV. Caregiving is when you've got to get up and actually do something, help them to the bathroom, help them to the shower, help them get in or out of their clothes, things like that. So I reduced that. She's got 5 hours down for that. I took away the entire 5 hours at [$]115, and added 2 hours at 25 an hour, which is caregiving rate.

The trial court also took issue with the claim for services performed by Dr. Viers that related to the recent remodeling that had not been approved by the court and disallowed those fees based upon the court's finding that the remodel mostly benefited Dr. Viers's family while it only benefited Ms. Capelli minimally.

As for the numerous pending fee requests, which the trial court reviewed in detail, the total fees requested were reduced in the following amounts:

1. For February 1, 2020 through December 31, 2020, the trial court approved fees totaling $53,872.50, reduced from $132,848.00.

2. For January 1, 2021 through June 30, 2021, the trial court approved $24,558.75, reduced from $66,585.00.

3. For July 1, 2021 through December 31, 2021, the trial court approved $21,142.00, reduced from $23,178.25.

4. For January 1, 2022 through June 30, 2022, the trial court approved $18,115.25, reduced from $20,447.00.

5. For July 1, 2022 through December 31, 2022, the trial court approved $17,202.25, reduced from $20,504.50.

6. For January 1, 2023 through December 31, 2023, the trial court approved $34,650.25, reduced from $38,191.50.

The court also ruled that it would not consider installing a pool on Ms. Capelli's property.

This appeal followed.

**ISSUES**

Dr. Viers raises the following issues:

I.      Whether the Trial Court erred when it reduced and recalculated the amount of time billed by [Dr. Viers] for work on the conservatorship?

II.     Whether the Court erred when it reduced the compensation rate of [Dr. Viers]?

III.    Whether the Trial Court erred when it summarily dismissed further consideration of a pool to be installed at the ward's home?

IV.    Whether [Dr. Viers] should be reimbursed her attorney's fees from the conservatorship if she is successful in this appeal?

Joseph Capelli raises no additional issues but requests an award of attorney's fees incurred on appeal.

**STANDARD OF REVIEW**

This court's review of factual findings is "de novo upon the record with a presumption of correctness as to the findings of fact, unless the preponderance of the evidence is otherwise." *Bowden v. Ward*, 27 S.W.3d 913, 916 (Tenn. 2000). *See* also Tenn. R. App. P. 13(d). We review questions of law de novo with no presumption of correctness. *See In re Conservatorship of Hudson*, 578 S.W.3d 896, 905–06 (Tenn. 2018).

> [D]ecisions concerning modification of a conservator's duties, or the parameters of the conservatorship, do not require the heightened clear and convincing standard that the initial appointment of a conservator requires because the ward, in a modification action, is already under the court's control.
>
> .    .    .
>
> In conservatorship cases, the Legislature has not outlined specific factors for the trial court to consider in making its best interest analysis. Accordingly, in conservatorship cases, the determination of the ward's best interest must necessarily turn upon the specific facts presented in that particular case. In

- 14 -

reviewing the trial court's determination of whether modification of an existing conservatorship order is in the best interest of the ward, this Court will review the factual issues *de novo* upon the record with a presumption of correctness. Tenn. R. App. P. 13(d).

*In re Conservatorship of Turner*, No. M2013-01665-COA-R3-CV, 2014 WL 1901115, at *24–25 (Tenn. Ct. App. May 9, 2014) (internal citation and footnote omitted).[7]

The standard of review of a trial court's order awarding fees in a conservatorship is the abuse of discretion standard. *See Am. Nat. Bank v. Bradford*, 188 S.W.2d 971, 980 (Tenn. Ct. App. 1945) (explaining that the "court may, in its discretion, make a reasonable allowance and compensation to the guardian for his trouble and expense in settling the business of his ward's estate"); *see also In re Conservatorship of Hudson*, 578 S.W.3d at 906; *In re Conservatorship of Lindsey*, No. W2011-00196-COA-R3-CV, 2011 WL 4120664, at *4 (Tenn. Ct. App. Sept. 16, 2011); *Taylor v. Fezell*, 158 S.W.3d 352, 359 (Tenn. 2005). Although the abuse of discretion standard of review envisions a less rigorous review of the trial court's discretionary decisions, the standard does not immunize a trial court's decision from any meaningful appellate scrutiny. *Lee Med., Inc. v. Beecher*, 312 S.W.3d 515, 524 (Tenn. 2010). As the Supreme Court explained, "*[d]iscretionary decisions must take the applicable law and the relevant facts into account.* An abuse of discretion occurs when a court strays beyond the applicable legal standards or when it fails to properly consider the factors customarily used to guide the particular discretionary decision." *Id.* (emphasis added). The court further explained that the abuse of discretion standard involves a three-part analysis:

> reviewing courts should review a [trial] court's discretionary decision to determine (1) whether the factual basis for the decision is properly supported by evidence in the record, (2) whether the [trial] court properly identified and applied the most appropriate legal principles applicable to the decision, and (3) whether the [trial] court's decision was within the range of acceptable alternative dispositions. When called upon to review a [trial] court's discretionary decision, the reviewing court should review the underlying factual findings using the preponderance of the evidence standard contained in Tenn. R. App. P. 13(d) and should review the [trial] court's legal determinations de novo without any presumption of correctness.

*Id.* at 524–25 (citations omitted). Thus, a trial court abuses its discretion when it causes an injustice to the party challenging the decision by applying an incorrect legal standard or

---

[7] We further noted in *Turner*, "From our research, it appears that the majority view is application of the preponderance standard in cases of modification of conservatorship orders." 2014 WL 1901115 25, n.3.

basing its decision on a clearly erroneous assessment of the evidence and reaching a decision that was not within the range of acceptable alternative dispositions. *See id*. at 524.

## ANALYSIS

### I.

At its core, the purpose of a conservatorship proceeding is to protect the person and property of a disabled person. *In re Conservatorship of Clayton*, 914 S.W.2d 84, 90 (Tenn. Ct. App. 1995) (citations omitted). By statutory definition, a *conservatorship* is "a proceeding in which a court removes the decision-making powers and duties, in whole or in part, in a least restrictive manner, from a person with a disability who lacks capacity to make decisions in one or more important areas and places responsibility for . . . those decisions in a conservator or co-conservators . . . ."[8] Tenn. Code Ann. § 34-1-101(4)(B). The statutory definition of *conservator* is "a person . . . appointed by the court to exercise the decision-making rights and duties of the person with a disability in one or more areas in which the person lacks capacity as determined and required by the orders of the court . . . ." Tenn. Code Ann. § 34-1-101(4)(A).

"Conservators are court appointed fiduciaries who act as agents of the court and their rights and responsibilities are set forth in the court's orders."[9] *AmSouth Bank v. Cunningham*, 253 S.W.3d 636, 641 (Tenn. Ct. App. 2006). "The court itself is ultimately responsible for the disabled persons who come under its care and protection, *Hinds v. Buck*, 177 Tenn. 444, 448, 150 S.W.2d 1071, 1072 (1941); *In re Ellis*, 822 S.W.2d 602, 607 (Tenn. Ct. App. 1991), and thus conservators act as the court's agent and are under the court's supervision." *In re Conservatorship of Clayton*, 914 S.W.2d at 90 (citation modified).

---

[8] "Person with a disability" means "any person eighteen (18) years of age or older determined by the court to be in need of partial or full supervision, protection, and assistance by reason of mental illness, physical illness or injury, developmental disability, or other mental or physical incapacity . . . ." Tenn. Code Ann. § 34-1-101(14).

[9] Persons do not attain the office of conservator by contract or family relationship. They are appointed to act in the best interests of the disabled adult person for whom they are partially or fully responsible in the discretion of the court. Although there is a statutory order of priority of persons the court is to consider when selecting a conservator, the order of priority is subject to the court's determination of "what is in the best interests of the disabled person." *See In re Rockwell*, 673 S.W.2d 512, 516 (Tenn. Ct. App. 1983) (holding the selection of the person to be appointed guardian is a matter which is committed largely to the discretion of the appointing court, and an appellate court will interfere with the exercise of this discretion only in case of a clear abuse).

*AmSouth Bank v. Cunningham*, 253 S.W.3d at 642 (footnote omitted) (citation modified).

A thorough discussion of the purpose of a conservatorship and the respective roles of the conservator and the court supervising the conservatorship is set forth in *AmSouth Bank v. Cunningham*, as follows:

> A conservator occupies a fiduciary position of trust of the highest and most sacred character. *Grahl v. Davis*, 971 S.W.2d 373, 377 (Tenn. 1998) (citing *Meloy v. Nashville Trust Co.*, 177 Tenn. 340, 149 S.W.2d 73 (1941)). Although the conservator plays a most important fiduciary role, it is significant to note that "the court itself is ultimately responsible for the disabled persons who come under its care and protection." *In re Conservatorship of Clayton*, 914 S.W.2d 84, 90 (Tenn. Ct. App. 1995) (citing *Hinds v. Buck,* 177 Tenn. 444, 150 S.W.2d 1071, 1072 (1941); *In re Ellis*, 822 S.W.2d 602, 607 (Tenn. Ct. App. 1991)).
>
> The authority, rights and responsibilities of a conservator are not independent of the court. "Conservators act as the court's agent and are under the court's supervision." *Clayton*, 914 S.W.2d at 90. The courts appointing conservators "retain continuing control over guardians and conservators because the persons who accept these appointments become 'quasi-officials' of the court appointing them." *Clayton*, 914 S.W.2d at 92 (citing *Logan v. Graper*, 155 Tenn. 565, 4 S.W.2d 955, 956 (1927)).
>
> Following a conservator's appointment, the court may discharge a conservator or modify the duties and authority of the conservator if the court determines the conservator has failed to perform its duties and obligations, or if the court determines the conservator has failed to act in the ward's best interest so as to warrant modification. Tenn. Code Ann. § 34-3-108(a). Because a conservator is in a sense the agent through whom the probate court manages the affairs of a ward, the right to choose its representative is important to the tribunal. *Monteverde v. Christie*, 23 Tenn. App. 514, 134 S.W.2d 905, 910 (1939). An appellate court, far removed from the scene will be slow, indeed, to substitute its judgment for that of the probate court. *Id.*
>
> .     .     .
>
> Further, Tenn. Code Ann. § 34-1-123 expressly authorizes the [trial] court "in its discretion" to summon a fiduciary before the court and, if cause be shown, remove the conservator for any abuse, mismanagement, neglect or failure to perform her duties. . . .
>
> . . . Nevertheless, the removal of a guardian is a matter of discretion, which is not to be disturbed except upon a clear case of abuse of such discretion.

*Monteverde*, 134 S.W.2d at 910. We see no reason to treat the modification of the authority, power, and duties of a conservator in a different fashion.

*AmSouth Bank v. Cunningham*, 253 S.W.3d at 642–44 (citation modified) (footnote omitted).

## II.

The trial court reviewed Dr. Viers's pending fee requests based on a retroactive bifurcated pay scale, one for management or "conservator" services, at the previously authorized rate of $115 per hour, and a significantly reduced rate for caregiving service, at the rate of $25 per hour. The trial court also reduced the total hours billed by Dr. Viers for caregiving services, particularly evening and overnight caregiving, which Dr. Viers provided when a privately retained caregiver was unavailable. For services to be rendered in the future, meaning going forward, the court established one rate of compensation, $25 per hour.

## A.

The unique facts of this case present a significant challenge for any court to ascertain which services should be compensable and the rate of compensation to be provided for the various services Dr. Viers provides. Thus, we begin by applauding the trial court for its thoroughness and detailed analysis of the time entries and types of services rendered. Upon review of the trial court's lengthy analysis of the various services rendered by Dr. Viers and the fees charged, it is apparent that the trial court was endeavoring to ascertain which of the services rendered by Dr. Viers were necessary and what rate of compensation was appropriate for the types of services rendered by Dr. Viers.

Credit and recognition must also go to Dr. Viers for two decades of service and care that she has provided her sister, services she has no legal obligation to provide that should not go without reasonable compensation.[10]

The various services rendered by Dr. Viers that are at issue can be categorized into two broad areas. One involves the "caregiving services" that Dr. Viers personally provides when a privately retained caregiver is unavailable to care for Ms. Capelli. The other area of service, which we refer to as management or conservatorship services, includes without limitation managing and overseeing five employees (the privately retained caregivers),

---

[10] We note that two siblings of Dr. Viers and Ms. Capelli, as well as a niece, submitted written statements approving of Dr. Viers's care for Ms. Capelli and her management of conservatorship assets and finances. Joseph Capelli Jr. was the only family member to object to Dr. Viers's services or fee requests.

maintaining records to provide to Chubb for payment or reimbursement of caregiver expenses, as well as detailed income and expenses needed for annual court accountings and income tax return preparation,[11] overseeing Ms. Capelli's financial portfolio and investments, the present value of which exceeds $7.1 million, management of the house owned by Ms. Capelli, payment of expenses, overseeing Ms. Capelli's medical needs and authorizing health care services, managing medications, consulting with accountants and legal professionals, and maintenance or replacement of property owned by Ms. Capelli.

B.

The trial court has broad discretion in setting the conservator's hourly rate of compensation based on Tennessee Code Annotated § 34-1-112(a) and other relevant factors, and in approving fees for services rendered. And in doing so, the trial court's determination "must necessarily turn upon the specific facts presented in that particular case." *In re Conservatorship of Turner*, 2014 WL 1901115, at *25.

Three specific facts particular to this case are, first, that Ms. Capelli has significant assets, particularly financial investments which have grown during this conservatorship from $3,895,000 at the inception that now exceed $7.1 million, which are available to maintain and enhance Ms. Capelli's quality of life. Second, Ms. Capelli requires around-the-clock care, and the bulk of her caregiving expenses are paid for by Chubb Insurance pursuant to the personal injury settlement. Finally and significantly, Ms. Capelli is exceedingly happy residing with and being part of Dr. Viers's family. And when considering these unique facts, the court should consider the personalized and enhanced services and amenities Ms. Capelli would likely choose if she could make her own decisions. *See Kilby v. Kilby*, No. 03A019712-CH00549, 1999 WL 76065, at *5 (Tenn. Ct. App. Jan. 28, 1999).

C.

In the order this appeal arises from, the trial court reduced the hourly rate "going forward" from $115 per hour to $25 per hour regardless of the type of services rendered. Furthermore, although the court applied the $115 rate to conservator services rendered by Dr. Viers, the court retroactively reduced the rate to $25 per hour for caregiving services.

---

[11] While Dr. Viers was responsible for preparing the requisite financial records, the conservatorship retained a CPA to prepare the tax returns and an attorney to assist with the annual accountings to be filed with the court.

Dr. Viers does not challenge the trial court's authority to retroactively modify her hourly rate of compensation or to reduce the hours billed for her services.[12] Instead, she contends that this is a complex conservatorship, and as a licensed counseling psychologist with a doctorate degree who engages in her professional occupation, she is entitled to be compensated pursuant to the factors set forth in Tennessee Code Annotated § 34-1-112, which justifies a rate of compensation well above $25 per hour.

Her fee motion noted the statutory factors that a court shall consider when approving compensation: 1) the complexity of the ward's property; 2) the amount of time the conservator spends performing duties to the ward; 3) the time deprived from the conservator's normal occupation; 4) whether the conservator would be obligated to provide those services if a fiduciary was not needed; and 5) other matters the court deems appropriate. Tenn. Code Ann. § 34-1-112(a).

We begin our analysis with the first statutory factor, the complexity of this conservatorship. In the order reducing Dr. Viers's hourly rate, the court made the factual finding that this is not a complex conservatorship case. We, however, have determined that the evidence preponderates against this finding.[13] Instead, the evidence preponderates in favor of a finding that this is a complex conservatorship case, as found by the trial court in 2016:

> this conservatorship involves a complex estate that requires a substantial amount of Catherine Viers' time, including but not limited to, managing and overseeing five employees, filing taxes, filing accounting of medical expenses for insurance reimbursement, filing accountings with the court, overseeing substantial assets, overseeing the healthcare and well-being of the ward, scheduling and attending appointments with ward's multiple health care providers, managing medications, consulting with legal professionals, as well as other time demanding concerns.

---

[12] While Dr. Viers's brief references the doctrines of law of the case and res judicata, she does not present a developed argument based on either doctrine. Further, we note that Dr. Viers does not contend that she relied to her detriment on the rate of compensation established in the 2019 order. *See Barnes & Robinson Co., Inc. v. OneSource Facility Servs., Inc.*, 195 S.W.3d 637, 645 (Tenn. Ct. App. 2006) (quoting *Calabro v. Calabro*, 15 S.W.3d 873, 878 (Tenn. Ct. App. 1999)) (discussing promissory estoppel, which is based on "a promise which the promisor should reasonably expect to induce action or forbearance on the part of the promisee or a third person and which does induce such action or forbearance is binding if injustice can be avoided only by enforcement of the promise"). "The reason for the doctrine is to avoid an unjust result, and its reason defines its limits." *Id.* (quoting *Calabro*, 15 S.W.3d at 879).

[13] Appellate courts review a trial court's discretionary decision to determine, inter alia, whether the factual basis for the decision is properly supported by evidence in the record. *Lee Med., Inc.*, 312 S.W.3d at 524. We review the underlying factual findings using the preponderance of the evidence standard contained in Rule 13(d) of the Tennessee Rules of Appellate Procedure. *Id.* at 525.

In fact, the evidence supports a finding that this case is more complex now than in 2016 because Ms. Capelli's health has deteriorated, which necessitates more supervision by Dr. Viers. The estate of Ms. Capelli has increased substantially. The house, which was purchased with the consent of the guardian ad litem and the court, must be maintained and managed by Dr. Viers. The cash assets have grown substantially as the financial investments alone now exceed $7.1 million, which necessitate complex and voluminous tax reporting and annual court accountings. The five employees, Ms. Capelli's caregivers, must still be scheduled, managed, and compensated, and their services and compensation, including insurance benefits, must be compiled and forwarded to Chubb Insurance company for approval and reimbursement. And we agree with the observation, albeit rhetorical, made by Dr. Viers in her brief: "We argue that if this estate, valued at more than $7,000,000 and requiring the above duties of the Conservator, does not constitute a complex conservatorship, then what estate would under the statute?"

Regarding the second factor, Dr. Viers provides a detailed itemization of the time that these and other executive and administrative duties require and, importantly, many of these services require executive reasoning and management experience. Thus, Ms. Capelli and her estate benefit from the education and experience Dr. Viers possesses.

Factor three pertains to the time deprived from the conservator's normal occupation. The trial court found that Dr. Viers was not precluded from pursuing her occupation as a licensed counseling psychologist. But that is not the only component of this factor. What is to be considered is that Dr. Viers cannot serve her clients at the same time she is performing her duties as Ms. Capelli's conservator or caregiver. Thus, although she is not precluded from pursuing her occupation on a reduced schedule, the court should consider the time Dr. Viers was deprived from her occupation, regardless of the fact that these services do not prevent her from pursuing her occupation at other times on a part-time basis.

Factor four requires consideration of whether the conservator would be obligated to provide those services if a fiduciary was not needed. The answer to this question is "no." Dr. Viers is under no obligation to provide any of the services at issue, just as Joseph Capelli is under no such obligation. Thus, if Dr. Viers decides that the compensation she receives for the services she renders is inadequate, and she has indicated in her brief that she feels disrespected by the trial court's findings regarding some of the evening and overnight caregiving services she has rendered, as well as the greatly reduced rate of compensation for any and all services going forward, she may resign as she is under no obligation to continue serving as the conservator or as a caregiver.[14]

---

[14] As Dr. Viers states in her brief:

In such event, she would likely purchase her own home, noting that she and her husband owned their home in 2004 when she became a conservator and where they allowed Ms. Capelli to reside rent-free for years. In such event, Dr. Viers would certainly relocate her family to her new home, thereby leaving Ms. Capelli behind, which begs the important questions: Where would Ms. Capelli reside, who would be responsible for managing her care and her assets, and who would be providing around-the-clock care?

This is most significant because the record unequivocally establishes that Ms. Capelli has been well cared for under Dr. Viers's leadership, Ms. Capelli loves Dr. Viers, loves residing with her family, and has benefitted immensely from the services Dr. Viers has provided and personally rendered for Ms. Capelli's benefit for more than twenty years.

Realizing that Ms. Capelli would not want this dramatic change to occur, we abide by the guidance in *Kilby* and do for Ms. Capelli what she "would in all probability have done if possessed of good reason and good conscience." *Kilby*, 1999 WL 76065, at *5 (quoting 18 Tenn. Juris., *Mentally Ill and other Incompetents,* § 7). This is particularly relevant when a ward like Ms. Capelli has assets sufficient to pay a rate of compensation sufficient to receive personalized conservatorship services and other intangible benefits. Stated another way, Ms. Capelli would in all probability compensate her sister in an amount sufficient to cause her to not only continue serving as her conservator but for Dr. Viers and her family to continue residing with her and provide care when the privately retained caregivers are unavailable.

The fifth factor encourages the court to consider other matters it deems appropriate. The evidence in this record compels consideration of Ms. Capelli's quality of life as well as her enjoyment of a family community, of which she would be deprived if Dr. Viers resigns and removes her family from Ms. Capelli's home. In such event, the court may be compelled to follow Joseph Capelli's ill-conceived recommendation that Ms. Capelli be relocated to a smaller home or placed in assisted living.

However, this dramatic change is not necessary because, unlike most conservatorships, Ms. Capelli has the resources and assets to retain the services she desires to enhance the quality of life she presently experiences and deserves. It is undisputed that she loves residing with Dr. Viers and her family as well as community and companionship, which she would be deprived of if Joseph Capelli's recommendations were followed. And

---

The Trial Court's action of lowering the rate of compensation has put Dr. Viers in a tough position. To continue to provide the level of care and attention she does for her sister, Dr. Viers cannot work full-time in her profession and, therefore, is not providing income for her own family. By reducing the rate of compensation, Dr. Viers will be forced to take time away from the conservatorship to add in more work as a licensed psychologist thus harming the benefit to the ward.

as the trial court expressly found: "I think the benefit of living in her sister's home with her sister's family was good for her. She could not have -- or did not have a family of her own."

As noted earlier, the evidence preponderates in favor of the finding that this is a complex conservatorship case. Consequently, this case requires the services of a conservator who has the requisite skills and experience to manage the business of a complex conservatorship. While the record supports the trial court's decision to reduce the rate of compensation for caregiving services to $25 per hour, which is commensurate with the fees paid to the retained caregivers, the complexity of this case and Dr. Viers's professional attainments, skill, and judgment justify a management fee of $115 per hour as previously authorized by the trial court.[15] Stated another way, the record fails to justify a reduction of the rate of compensation for management services, and we are confident that Ms. Capelli would choose to retain the services of her sister to manage her conservatorship and would choose to compensate her sister at a level sufficient to assure her continued service as conservator. *See Kilby*, 1999 WL 76065, at *5.

With regard to Dr. Viers's rate of compensation when she renders caregiving services, which generally occurs when a privately retained caregiver is unavailable, we affirm the rate of compensation at $25 per hour, both retroactively applied and going forward, based on the fact that it is commensurate with what is paid the retained caregivers, such as Ms. Sariel.

Thus, we modify the decision to reduce Dr. Viers's rate of compensation for all services to $25 per hour, and we remand with instruction to continue paying Dr. Viers the previously established rate of $115 per hour for management services, while paying the $25 per hour rate for the caregiving services that she provides.[16]

---

[15] We also take judicial notice of the fact that Public Guardians under the Tennessee Department of Disability and Aging Public Guardianship have a sliding fee schedule where hourly rate for an estate with $30,500 to $49,999 in income per year and more than $50,000 in assets is $89.67 per hour. Ms. Capelli's conservatorship has income well exceeding this amount and assets worth more than $7,000,000.

[16] The foregoing notwithstanding, our decision in this matter does not restrict the trial court from supervising Dr. Viers's future activities or modifying her rate of compensation or fees generally. As is recognized in *AmSouth Bank v. Cunningham*:

> The authority, rights and responsibilities of a conservator are not independent of the court. "Conservators act as the court's agent and are under the court's supervision." *Clayton*, 914 S.W.2d at 90. The courts appointing conservators "retain continuing control over guardians and conservators because the persons who accept these appointments become 'quasi-officials' of the court appointing them." *Clayton*, 914 S.W.2d at 92 (citing *Logan v. Graper*, 155 Tenn. 565, 4 S.W.2d 955, 956 (1927)).

D.

We now turn our attention to Dr. Viers's contention that the trial court erred by disallowing blocks of time for services she rendered in managing the conservatorship and as a caregiver.

The caregiver services at issue pertain to evening and overnight caregiving services that Dr. Viers personally rendered when privately retained caregivers were unavailable. The other category pertains to Dr. Viers's activities in planning and supervising the most recent remodeling of Ms. Capelli's house.

We begin with the remodeling of the house. We first note that Dr. Viers sought to be compensated for services that she rendered in obtaining and supervising construction that was not court approved. Second, the trial court concluded: "I do not find that work significantly benefited the ward. I think it was for the benefit of the Viers and having a more aesthetically pleasing kitchen." In response, Dr. Viers contended that there was evidence to establish the need for the remodel and the benefit to Ms. Capelli. As she states in her brief, the court's finding ignores her testimony "of the need to remodel the kitchen bathroom so the ward would not have to go completely through the house to her room every time she needed to go to the bathroom, [and] it ignores the testimony of [Dr. Viers] that some of the appliances were not working and the cabinet doors had routinely fell off the kitchen cabinets."

Although these facts may have justified some of the work, Dr. Viers's failure to obtain prior court approval of the work deprived the trial court of disapproving the project or modifying the full scope of the work to be performed. And, although the work may have added to the property value, a property Ms. Capelli owns, the court found that some of it did not directly benefit Ms. Capelli, and the work that was done was paid for by the conservatorship.

---

Following a conservator's appointment, the court may discharge a conservator or modify the duties and authority of the conservator if the court determines the conservator has failed to perform its duties and obligations, or if the court determines the conservator has failed to act in the ward's best interest so as to warrant modification. Tenn. Code Ann. § 34-3-108(a). Because a conservator is in a sense the agent through whom the probate court manages the affairs of a ward, the right to choose its representative is important to the tribunal.

.    .    .

Further, Tenn. Code Ann. § 34-1-123 expressly authorizes the [trial] court "in its discretion" to summon a fiduciary before the court and, if cause be shown, remove the conservator for any abuse, mismanagement, neglect or failure to perform her duties. . . .

*AmSouth Bank v. Cunningham*, 253 S.W.3d at 642–43.

- 24 -

Considering the foregoing, we are unable to conclude that the trial court abused its discretion by disallowing Dr. Viers's fee request for obtaining and supervising the construction at issue.

We now turn our attention to the evening and overnight caregiving services rendered by Dr. Viers. Dr. Viers contends that she was compelled to provide these services when a privately retained caregiver was unavailable because Ms. Capelli requires around-the-clock care and supervision. The court did not disagree with the fact that Ms. Capelli requires around-the-clock care; however, it noted that "an agency caregiver doesn't live in that house. So if [Dr. Viers] is asleep . . . from 12 midnight to 8:00 a.m., that's not caregiving. That's not conservatorship work. . . ."

Dr. Viers contends that this finding ignores the fact that "someone needed to be with [Ms. Capelli] 24/7 and that someone needed to get up with [Ms. Capelli] to go to the bathroom at night." She also notes that if she is the one performing the work because an agency caregiver is not available, she is confined to the house to care for Ms. Capelli, and, as stated in her brief:

> Dr. Viers has no legal obligation to care for her sister other than as imposed by this conservatorship. By not compensating her for all her time being on call as a caregiver when another caregiver is not available, imposes on Dr. Viers an obligation to spend all that caregiving time with her sister uncompensated. Thus, the Court imposes a moral duty on Dr. Viers to continue to care for her sister without appropriate compensation.

This brings us back to the recognition that Ms. Capelli benefits greatly from being able to reside with Dr. Viers and her family. It is undisputed that caring for Ms. Capelli is "a lot of work," as admitted by Joseph Capelli. This creates additional duties for Dr. Viers when she is the caregiver, whether that be in the evening or overnight, noting the fact that someone needs to be with her no matter the time of day.

> Regarding his handful of visits with Ms. Capelli, Joseph Capelli testified:
> Q. Okay. You would agree with me that Patty is a lot of work when she's with you; correct?
> A. Yes.
> Q. She demands -- you heard testimony from a caregiver, she demands attention?
> A. Absolutely.
>
> .     .     .
>
> Q. You can tell when Patty is irritated and agitated; correct?
> A. Yeah, sure.

Q. And . . . because of her accident, she is a mentally disabled person who you have to care for?
A. Of course.

It is undisputed that Ms. Capelli requires care around the clock. Fortunately, unlike most conservatorships, Ms. Capelli can afford around-the-clock caregivers based on her assets, the projections of Mr. McPeak, and the fact that Chubb Insurance pays for most of their services pursuant to the settlement agreement resulting from her tragic accident. Thus, Dr. Viers is justified in assuring that a caregiver is present to aid Ms. Capelli around the clock, which occasionally requires that she, Dr. Viers, be the caregiver.

While it is clear that Dr. Viers benefits from residing in Ms. Capelli's home, the arrangement also clearly benefits Ms. Capelli by ensuring that around-the-clock care is always available, provided by a loved and trusted family member who has decades of experience with and knowledge of Ms. Capelli's condition and needs. And we've established that Ms. Capelli can afford to provide that type of attention for herself. Moreover, if a privately retained caregiver stays overnight, that caregiver is compensated for the entire period even if the caregiver slept during much of the shift.

We are confident that Ms. Capelli would choose to have her sister, Dr. Viers, attending to her needs in the evenings and overnight whenever a privately retained caregiver is unavailable and that she would want her sister to be appropriately compensated. Accordingly, Dr. Viers should be compensated for evening and overnight caregiving services that she renders when a privately retained caregiver is unavailable. Thus, we respectfully modify the decision of the trial court to reduce the number of hours for the evening and overnight caregiver services rendered by Dr. Viers and remand with instructions to approve the entire period indicated by Dr. Viers for her caregiving services at the caregiver rate of $25 per hour.

III.

Dr. Viers contends that the trial court erred when it summarily dismissed further consideration of a pool to be installed on the vacant lot owned by Ms. Capelli adjacent to the house where she lives.

The court ruled that it would not consider installing a pool on Ms. Capelli's property, noting that a public pool is five minutes away. While this fact is indeed relevant, the record does not reveal whether the court considered the standard of living available to Ms. Capelli, based in part on her substantial assets, and what Ms. Capelli would in all probability have done if possessed of good reason and good conscience. *See Kilby*, 1999 WL 76065 at *5 (quoting 18 Tenn. Juris., *Mentally Ill and other Incompetents,* § 7) ("[C]ourts, acting in *loco parentis*, and as general guardians for . . . persons of unsound mind, will do for them

and their property what [the ward] would in all probability have done if possessed of good reason and good conscience.").

Thus, when considering the scope and extent of amenities and corresponding expenditures to authorize for the benefit of Ms. Capelli, the court should consider the specific facts of each case, *see In re Conservatorship of Turner*, 2014 WL 1901115, at *25, and what in all probability she would have done, or would do, in deciding whether to construct a swimming pool on her property for her therapeutic needs and beyond. *Kilby*, 1999 WL 76065 at *5.

The unique facts to consider in this case include the vast assets owned by Ms. Capelli, that she owns a vacant lot adjacent to the house where she resides, and that with the aid of her therapist, Ms. Capelli frequently uses a public pool for both recreation and therapy, although she and presumably her wheelchair must be transported in a vehicle to use this pool. In addition to these facts, Dr. Viers testified about the benefits of a pool for Ms. Capelli as follows:

> Well, Patty always enjoyed exercising in the pool. My parents installed a pool in their yard so that she could have access to it. She's always enjoyed exercising in a pool. Because of her traumatic brain injury, she is not able to have balance. So when she's in the water she is weightless and it gives her a lot of mobility. It's very good for her joints and her muscles. And so our thought was that we could install a pool in the side lot that was purchased with the house so that Patty could have much more access to exercise and the health benefits of exercise in a pool.

Because the record does not reveal whether the trial court considered these facts alongside the legal principle in *Kilby*, *see Lee Med., Inc.*, 312 S.W.3d at 524 (noting that "[d]iscretionary decisions must take the applicable law and the relevant facts into account"), we remand this issue to the trial court to afford Dr. Viers the opportunity to present a plan as well as her reasoning for Ms. Capelli's need and desire for a pool to be constructed on her property. Our remand of this issue does not signal any decision we believe the court should make, suggesting only that the trial court consider the facts and principles referenced above, as well as any other facts and legal principles the court deems relevant.

IV.

Dr. Viers seeks to be reimbursed from the conservatorship the attorney's fees she incurred in this appeal pursuant to Tennessee Code Annotated § 34-1-113. The statute reads in pertinent part:

The fiduciary is entitled to pay from the property of the minor or person with a disability . . . court costs, attorney fees, . . . and such other expenses as the court determines are necessary for the fiduciary. The fiduciary shall not pay any attorney fee, guardian ad litem fee, fees for income tax preparation and court accountings or investment management fees until the amount of those fees is approved by the court.

*Id*.

Dr. Viers, the fiduciary of this conservatorship for Ms. Capelli, has prevailed on several issues and made meritorious arguments on the issues she did not prevail upon. Accordingly, we find that the reasonable and necessary attorney's fees and costs incurred by Dr. Viers in this appeal should be paid by the conservatorship. Thus, we remand this issue to the trial court to make that appropriate award.

V.

Joseph Capelli requests an award of his attorney's fees on appeal to be paid from Ms. Capelli's estate, pursuant to "the statutory entitlement based on the American Rule and Tenn. Code Ann. §34-1-113," as well as the four discretionary factors found in *Smallman v. Smallman*, 689 S.W.3d 845 (Tenn. Ct. App. 2023).

Generally, Tennessee courts adhere to the American Rule, which provides that a party to a civil action may not recover its attorney's fees in the absence of a statute, contractual provision, or other recognized ground allowing for recovery. *See Cracker Barrel Old Country Store, Inc. v. Epperson*, 284 S.W.3d 303, 308 (Tenn. 2009).

While the statutory provision in Tennessee Code Annotated § 34-1-113 provides for the fiduciary to be paid attorney's fees from the ward's estate, *fiduciary* is defined as "a guardian, coguardian, conservator, co-conservator, or qualified trustee as defined in § 35-16-102(12)(A)." Tenn. Code Ann. § 34-1-101(7). The statute further provides that the court may approve other expenses "upon a determination that they are reasonable and: (1) They protected or benefited the minor or person with a disability or such person's property; or (2) That their payment is in the best interest of the minor or person with a disability." Tenn. Code Ann. § 34-1-113(c).

The discretionary factors in *Smallman* provide:

"Whether to award attorney's fees on appeal is a matter within the sole discretion of this Court." *Hill v. Hill*, No. M2006-02753-COA-R3-CV, 2007 WL 4404097, at *6 (Tenn. Ct. App. Dec. 17, 2007) (citing *Archer v. Archer*, 907 S.W.2d 412, 419 (Tenn. Ct. App. 1995)). In determining whether an award is appropriate, we take into consideration "the ability of the requesting

- 28 -

party to pay the accrued fees, the requesting party's success in the appeal, whether the requesting party sought the appeal in good faith, and any other equitable factor that need be considered." *Id.* at \*6.

*Smallman*, 689 S.W.3d at 878 (citations omitted).

We have ascertained that the principal goal of Mr. Capelli is to remove Dr. Viers (and her husband) as conservator and place Ms. Capelli in a smaller home or an assisted living facility, to be cared for by employed caretakers, instead of cared for and surrounded by the presence of family, which, based on the facts of this case, cannot conceivably be deemed to benefit Ms. Capelli.

Joseph Capelli's voice did bring to the court's attention concerns regarding the fee schedule for conservatorship or management duties and caretaking duties. However, we are unable to conclude that this justifies paying his attorney's fees on appeal from Ms. Capelli's estate.

Accordingly, we respectfully deny Mr. Capelli's request for attorney's fees on appeal.

## CONCLUSION

The judgment of the trial court is affirmed in part, modified in part, and this matter is remanded for further proceedings consistent with this opinion. One half of the costs of appeal are assessed against the appellee, Joseph J. Capelli Jr., and one half are assessed against the Conservatorship for Patricia J. Capelli.

_____
FRANK G. CLEMENT JR., P.J., M.S.